QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Shon Morgan (Bar No. 187736)
  shonmorgan@quinnemanuel.com
  Valerie Roddy (Bar No. 235163)
  valerieroddy@quinnemanuel.com
  Joseph R. Ashby (Bar No. 248579)
  josephashby@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Defendant Hyundai Motor America

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| KEHLIE R. ESPINOSA, LILLIAN E. LEVOFF, THOMAS GANIM, and DANIEL BALDESCHI, on behalf of herself and all others similarly situated,<br><br>          Plaintiffs,<br><br>     vs.<br><br>HYUNDAI MOTOR AMERICA; and DOES 1 through 10, inclusive,<br><br>          Defendants. | CASE NO. CV 12-0800-GW (FFMx)<br><br>**DEFENDANT HYUNDAI MOTOR AMERICA'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>[Appendix of Variation in State Laws; Declarations of Jon Budd, Steve R. Johnson, Lien Nguyen, William J. (Trea) Reedy, III, and Shon Morgan; Expert Reports of Dr. Itamar Simonson and Dr. Keith R. Ugone, and Request for Judicial Notice with the Declaration of Joseph R. Ashby filed concurrently herewith]<br><br>Date:   November 29, 2012<br>Time:   8:30 a.m.<br>Crtrm.: 10<br>Hon. George Wu<br><br>Courtroom:<br><br>Filing Date: January 6, 2012 |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................1

RELEVANT FACTUAL BACKGROUND ....................................................2

ARGUMENT .................................................................................................11

I.   PLAINTIFFS CANNOT SHOW COMMON ISSUES
     PREDOMINATE ..................................................................................11

     A.   Plaintiffs Bear the Burden to Demonstrate Commonality and that
          Common Issues Predominate.......................................................11

     B.   Reliance/Causation Raise Individual Issues ...............................12

          1.   Many Consumers Would Not Have Seen the Challenged
               Ads .....................................................................................12

          2.   Whether the Challenged Advertisements Misled
               Purchasers Raises Individual Issues of Reliance and
               Causation ............................................................................15

          3.   Materiality Raises Individual Issues...................................16

     C.   Plaintiffs Have Not Shown An Injury Common To All Class
          Members or A Reliable Damages Methodology ..........................18

II.  THE NAMED PLAINTIFFS ARE NOT TYPICAL .....................................19

III. THE VAST PROPOSED CLASSES ARE OVERBROAD AND
     VIOLATE ARTICLE III......................................................................21

IV.  PLAINTIFFS CANNOT JUSTIFY A NATIONWIDE CLASS ...................22

     A.   Applicable State Laws Vary Significantly..................................23

     B.   Each State Has an Interest In Applying Its Consumer Laws.......23

     C.   Any California Interest In Applying Its Law Should Yield to
          Other States ...............................................................................24

CONCLUSION...............................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

<u>Cases</u>

4

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ............................................................. 11

5

6

*Avritt v. Reliastar Life Ins. Co.,*
    615 F.3d 1023 (8th Cir. 2010) ............................................. 21

7

*In re Bridgestone/Firestone, Inc.,*
    288 F.3d 1012 (7th Cir. 2002) ............................................. 23

8

9

*Burdick v. Union Sec. Ins. Co.,*
    2009 WL 4798873 (C.D. Cal.  Dec. 9, 2009)....................... 21

10

*Carpenter v. BMW of N. Am., Inc.,*
    1999 WL 415390 (E.D. Pa. June 21, 1999) ......................... 20

11

12

*Chavez v. Blue Sky Natural Beverage Co.,*
    268 F.R.D. 365 (N.D. Cal. 2010) ........................................ 18

13

*Cohen v. DirecTV, Inc.,*
    178 Cal. App. 4th 966 (2d Dist. 2009) ................................ 12

14

*Commodity Futures Trading Comm'n v. White Pine Trust Corp.,*
    2007 WL 1754819 (S.D. Cal. Apr. 20, 2007) ...................... 14

15

16

*Denney v. Deutsche Bank*
    *AG*, 443 F.3d 253, 264 (2d Cir. 2006)................................. 21

17

18

*Discover Bank v. Super. Ct.,*
    134 Cal. App. 4th 886 (2d Dist. 2005) ................................ 24

19

*Edwards v. Ford Motor Co.,*
    2012 WL 2866424 (S.D. Cal. June 12, 2012) ...................... 16

20

21

*Federal Trade Comm'n v. Figgie Int'l, Inc.,*
    994 F.2d 595 (9th Cir. 1993) ............................................... 14

22

*In re Ford Motor Co. Ignition Switch Prods. Liability Litig.,*
    174 F.R.D. 332 .................................................................... 25

23

24

*Gartin v. S & M NuTec LLC,*
    245 F.R.D. 429 (C.D. Cal. 2007)......................................... 20

25

*In re HP Inkjet Printer Litig.,*
    2008 WL 2949265 (N.D. Cal. July 25, 2008) ...................... 23

26

27

*Haley v. Medtronic, Inc.,*
    169 F.R.D. 643 (C.D. Cal. 1996)......................................... 25

28

*Hanon v. Dataproducts Corp.,*
   976 F.2d 497 (9th Cir. 1992) .................................................................. 20

*Horne v. Flores,*
   557 U.S. 433 (2009) ............................................................................... 21

*In re Hydrogen Peroxide Antitrust Litig.,*
   552 F.3d 305 (3d Cir. 2008) .................................................................. 11

*In Grand Theft Auto Video Game Consumer Litig.,*
   251 F.R.D. 139 (S.D.N.Y. 2008) ........................................................... 25

*Johnson v. General Mills, Inc.,*
   275 F.R.D. 282 (C.D. Cal. 2011) ..................................................... 14, 15

*Kaldenbach v. Mutual of Omaha Life Ins. Co.,*
   178 Cal. App. 4th 830 (4th Dist. 2009) .................................................. 14

*Kim v. Gen. Motors LLC,,*
   No. CV 11-06459 GAF (MRWx),
   (C.D. Cal. Mar. 9, 2012) (RJN Exh. 14) .................................................. 5

*Kwikset Corp. v. Super. Ct.,*
   51 Cal. 4th 310 (2011) ........................................................................... 12

*Mazza v. Am. Honda Motor Co., Inc.,*
   666 F.3d 581 (9th Cir. 2012) ......................................... 13, 21, 22, 23, 24

*Mirkin v. Wasserman,*
   5 Cal. 4th 1082 (1993) ........................................................................... 12

*O'Shea v. Epson Am., Inc.,*
   2011 WL 4352458 (C.D. Cal. Sept. 19, 2001) ....................................... 21

*Offshore Rental Co. v. Cont'l Oil Co.,*
   22 Cal. 3d 157 (1978) ............................................................................ 24

*Oshana v. Coca-Cola Co.,*
   472 F.3d 506 (7th Cir. 2006) ................................................................. 22

*Panoutsopoulos v. Chambliss,*
   157 Cal. App. 4th 297 (1st Dist. 2007) ................................................. 12

*Pfizer Inc. v. Super. Ct.,*
   182 Cal. App. 4th 622 (2d Dist. 2010) ............................................. 12, 13

*Phillips Petroleum Co. v. Shutts,*
   472 U.S. 797 (1985) ............................................................................... 23

*In re Prempro,*
   230 F.R.D. 555 (E.D. Ark. 2005) .......................................................... 15

*Sanchez v.  Wal-Mart Stores, Inc.,*
   2009 WL 1514435 (E.D. Cal. May 28, 2009)
   *reconsideration denied by,* 2009 WL 2971553 (Sept. 11, 2009) ........... 20

*Sateriale v. R.J. Reynolds Tobacco Co.*,
   --- F.3d. ---, 2012 WL 4857215 (9th Cir. Oct. 15, 2012) .................................... 12

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
   2012 WL 1015806 (N.D. Ill. Mar. 22, 2012) ...................................................... 22

*Sevidal v. Target Corp.*,
   189 Cal. App. 4th 905 (4th Dist. 2010) ................................................................ 12

*Spence v. Glock, Ges.m.b.H.*,
   227 F.3d 308 (5th Cir. 2000) ................................................................................. 23

*Sprague v. Gen. Motors Corp.*,
   133 F.3d 388 (6th Cir. 1998) ................................................................................. 20

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ............................................................................... 13

*Stutman v. Chem. Bank*,
   731 N.E.2d 608 (N.Y. 2000) .................................................................................. 25

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) ............................................................... 2, 14, 15, 19, 21

*UFCW Local 1776 v. Eli Lilly and Co.*,
   620 F.3d 121 (2d Cir. 2010) ................................................................................. 15

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ................................................................................... 11, 19

*Washington Mut. Bank, FA v. Super. Ct.*,
   24 Cal. 4th 906 (2001) ........................................................................................... 24

*Webb v. Carter's Inc.*,
   272 F.R.D. 489 (C.D. Cal. 2011) .................................................................... 16, 21

*Weiner v. Snapple Beverage Corp.*,
   2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ................................................. 18, 19

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ........................................................... 19, 23, 25

## **Statutes**

16 C.F.R. § 259.2 ........................................................................................................ 3

40 C.F.R. § 600.307-86 .............................................................................................. 5

49 U.S.C. § 32908 ....................................................................................................... 5

Cal. Civ. Code § 1761 .............................................................................................. 20

Fed. R. Civ. P. § 23 ............................................................................................ 11, 19

N.J. Stat. Ann. § 56:8-19 (West 2012) ........................................................ 25

**Preliminary Statement**

This Court already gutted plaintiffs' original theory and limited plaintiffs to claims based on advertisements, if any, where Hyundai included mileage figures that differed from the EPA estimates or that did not include certain additional disclosures. As will be shown at summary judgment, no such ads exist, thus plaintiffs' claims will fail as a matter of law on the merits.

Nor is either proposed class certifiable. Plaintiffs' theory implicates at minimum the following inquiries: (1) whether a given consumer saw a potentially actionable ad; (2) whether that ad played any role in the purchase decision; (3) whether the consumer saw the full disclosures from other Hyundai materials or third party sources before purchase (thus breaking the causal chain); (4) whether the disclosures were even material to a given consumer; and (5) whether the consumer achieved the advertised mileage and thus was not injured.

Here, the testimony of the named plaintiffs exposes the impropriety of class treatment. Some class members, like plaintiff Ganim, would have seen some or all of the disclosures that appeared in the ads. Some consumers, like plaintiff Baldeschi, would have assumed these were EPA figures whether they saw the disclosures or not. Some class members, like Ganim and Baldeschi, would have also seen the full EPA disclosures in other Hyundai materials before purchase. Other consumers, like Levoff and Ganim, would agree that the EPA disclosures were completely immaterial to their purchase decision, and that seeing them would not have made any difference. This evidence is corroborated by a consumer survey that, among other relevant data, shows consumers place virtually no weight on the presence of EPA disclosures, have no uniform idea how those estimates are derived, and rank manufacturer advertisements dead last in terms of factors that influence purchase decisions. Plaintiffs, by contrast, offer no survey or other evidence that would suggest any appreciable portion of the putative classes contends they were misled on the narrow theory now at issue.

On this record, plaintiffs are not entitled to any presumption of materiality or reliance; their class definition violates Article III's standing requirements; and they cannot establish typicality—just as a Central District judge recently ruled in a similar consumer class action, and as numerous courts have concurred in denying certification after *Tobacco II*.  Conscientious companies like Hyundai should not be forced to defend a class challenge based on inapplicable certification presumptions and a factual record that shows this vast consumer class bought their cars based on a differing mix of disclosures, had varying levels of existing and acquired knowledge about the use and meaning of EPA estimates, and where the disclosures at issue were completely immaterial to most class members.

## Relevant Factual Background

**The Court's Motion to Dismiss Order Significantly Narrowed the Scope of Plaintiffs' Claims**.  As to any allegations that Hyundai's EPA-based fuel economy estimates are inaccurate or do not reflect supposed "real world" mileage, the Court has already held that "such challenges would be barred by the doctrine of primary jurisdiction" and therefore plaintiffs' claims "must be considered without regard to the allegations that the EPA Estimate is incorrect."  (RJN Exh. 13 at 47).  Second, the Court held that to the extent plaintiffs' claims rest on Hyundai's "mere use of the EPA estimates with related federally-mandated disclosures in Hyundai's advertising and marketing materials, such claims are preempted."  (*Id.* at 48).  The Court relatedly ruled that "any claims that rest on Hyundai's failure to disclose *more* than what is federally mandated must be preempted."  (*Id.*).  Third, the Court limited plaintiffs' claims to "products they personally purchased and misrepresentations they actually saw."  (*Id.*).[1]

---

[1]   Given the Court's previous ruling, plaintiffs' lengthy and largely inaccurate account of the development of the Elantra is immaterial.  The inaccuracies and lack
(footnote continued)

**<u>Hyundai's Advertised Mileage Was Identical to EPA-Based Estimates,</u>**
**<u>and All Advertising Included Disclosures Consistent With FTC Guidance.</u>**

Plaintiffs concede that the mileage estimates Hyundai advertised for the Elantra (40 MPG highway) and Sonata (35 MPG highway) are the same as the estimates based on EPA test protocols.  (Morgan Decl. Exh. 1 (Baldeschi Tr.) at 53:14-54:9 (agreeing the 35 MPG figure on the EPA window sticker was consistent with Hyundai's advertising); *id.* Exh. 2 (Ganim Tr.) at 34:1-14 (same for Elantra)).

Not only are all advertised MPG estimates consistent with EPA-based figures, but all of Hyundai's television, print, and Internet advertising that includes MPG references complies with the FTC's advisory *Guide Concerning Fuel Economy Advertising for New Automobiles* ("*Fuel Economy Guides*"), 16 C.F.R. §§ 259.1, 259.2,[2] by disclosing that (a) these are EPA mileage estimates, and (b) typically also that "actual mileage may vary."  (Reedy Decl., ¶¶ 6-13, 15-19, 21, 23-30, 34-39, 49-53, Exhs. 1-11, 13-29, 38-41; Budd Decl., ¶¶ 4-9, Exh. 2).[3]  In Hyundai's television advertisements, these disclosures appear on screen when the audio or visual fuel economy claim is made.[4]  Additionally, Hyundai's visual disclosures are prominent,

---

of context are unsurprising given that plaintiffs elected not to depose even a single Hyundai employee.  (Morgan Decl., ¶ 6).

    [2]  The *Fuel Economy Guides* are merely "advisory in nature."  Federal Trade Commission, *Guide Concerning Fuel Economy Advertising for New Automobiles*, 40 Fed. Reg. 42,003, 42,003, 42,004 (1975); *Guide Concerning Fuel Economy Advertising for New Automobiles*, 76 Fed. Reg. 31,467, at n.2 (2011) (*Guides* "do not have the force and effect of law and are not independently enforceable").

    [3]  Plaintiffs suggest Hyundai has been tardy producing documents relating to the Sonata, Br. at 15 n.1, McCune Decl. ¶ 73; however, plaintiffs did not have a basis to seek Sonata documents until plaintiff Baldeschi was added on August 2, 2012. Hyundai agreed to produce documents for the 2011-12 Sonata with a 2.4L engine without requiring a new discovery request.  (Morgan Decl, ¶ 7).

    [4]  Contrary to plaintiffs' contention, (Br. at 7), the *Fuel Economy Guides* do not require both an audio and video disclosure for EPA MPG estimates.  *Compare* 16 C.F.R. § 259.2 n.5 (as to EPA MPG estimates, not expressly addressing a claim

(footnote continued)

1  presented in clear language, properly placed, and in close proximity to the
2  associated claim. *Id.* [5]

3      Hyundai's print advertisement for the 2011-12 model year Elantra and Sonata
4  include similar, and in many instances identical, disclosures as Hyundai's television
5  advertisements. (Reedy Decl. ¶¶ 23-30, 37-39, Exhs. 13-18, 26-29). Assessing
6  disclosures in print advertisements requires consideration of the size of the original
7  advertisement, thus it is misleading for plaintiffs to proffer images of advertisements
8  imbedded in another document. (*E.g.*, McCune Decl., Exh. 18 (advertisement
9  pasted into a Word document), Exh. 20 (advertisement pasted into a PowerPoint
10 presentation). Hyundai's print advertisements, when considered as actually seen by
11 consumers, provide visible disclosures that comply with *Fuel Economy Guides.*[6]

12      Similarly, the brochure for the 2012 model year Elantra include the following
13 disclosure immediately below the MPG estimates:

> EPA estimates listed are highway ratings for comparison. Your actual
> mileage will vary with options, driving conditions, driving habits, and
> your vehicle's condition.

16 (Reedy Decl., ¶ 51, Exh. 39). Additionally, later in the brochure immediately below
17 a box captioned as "EPA MILEAGE ESTIMATES," Hyundai discloses that: "Fuel
18 economy estimated by EPA for comparison only." (*Id.* at 83). *See also* (*Id.*, ¶¶ 50,
19 52-53, Exhs. 38, 40-41) (similar language in other relevant brochures).

---

20
21 that appears in both the audio and video) *with* 16 C.F.R. § 259.2 nn 7-8 (as to non-
EPA MPG estimates, expressly addressing claims that appear in audio and video).
22   [5] These factors are based on the FTC's *Advertising Enforcement: Disclosures in*
23 *Advertising*, and should be considered with the *Fuel Economy Guides. See*
http://www.ftc.gov/bcp/workshops/disclosures/cases/index.html ("In evaluating the
24 effectiveness of disclosures, the Commission considers factors such as . . .
25 **Prominence**[;] . . . **Presentation**[;] . . . **Placement**[;] . . . **Proximity**").
   [6] The print advertisements satisfy the placement and proximity requirements
26 because the disclosure appears on the same page as the associated claim and on a
27 background that enables the consumer to read the disclosure. (Reedy Decl., Exhs.
13-18, 26-29)
28

Hyundai's Internet advertisements that appear on third-party websites also link to a disclosure footnote on Hyundai's website. (Budd Decl., ¶¶ 5-7, Exh. 2).[7]

**The Federal Government Mandates EPA-Based Fuel Economy Estimates.** Hyundai's advertised mileage figures were consistent with the federal mandate that all auto manufacturers attach in a prominent place on all new automobiles labels that disclose, among other things, the fuel economy based on EPA testing protocols and estimated annual fuel cost. 49 U.S.C. § 32908(b). Federal regulations prescribe the content of the "window sticker." 40 C.F.R. § 600.307-86(a)(2), (a)(3) (2011) (specifying titles, information, font size, logos, disclosures). The EPA window sticker for the 2011-12 Elantra is reproduced below:



(Nguyen Decl., ¶¶ 4-5, Exhs. 1-2). This window sticker, which also describes the car's "Features" and MSRP, provides the following MPG information,

---

[7] In another case involving EPA MPG advertising, Judge Feess endorsed footnote disclosures. *See Kim v. Gen. Motors*, LLC, No. CV 11-06459 GAF (MRWx), (C.D. Cal. Mar. 9, 2012) *Kim*, *slip op.* at 13 (RJN Exh. 14) ("GM has done nothing more than utilize footnotes to comply with disclosure rules").

- "[e]xpected range for most drivers [is] **33** to **47** MPG" highway;

- "[e]xpected range for most drivers [is] **24** to **34** MPG" city; and

- "**[y]our actual mileage will vary** depending on how you drive and maintain your vehicle."

(*Id*.).  Similar disclosures appear on the Sonata window sticker, with corresponding MPG figures.  (*Id*., Exhs. 3-5).

**<u>Independent Sources Have Confirmed The Hyundai ElantraAnd Sonata Mileage Figures</u>.**  For less than $20,000, the Elantra provides drivers with EPA mileage estimates of 40 MPG/highway, 29 MPG/city, and 33 MPG/combined, making the 2011 Hyundai Elantra the only one of TrueCar.com's "Top 10 Most Fuel-Efficient Cars" that was not a hybrid (as well as the most affordable of the ten by a wide margin).  (RJN Exh. 3)  In January 2012, it was named North American Car of the Year at the North American International Auto Show (bestowed by a jury of 50 veteran automotive journalists).  (RJN Exhs. 1-2)

Although the motion to dismiss ruling renders actual mileage largely irrelevant for purposes of this motion except as it bears on plaintiffs' problematic damages approach, various independent sources concluded the Elantra does achieve highway MPG consistent with the EPA estimates.  For example, *Popular Mechanics* tested the 2012 Elantra and concluded that "[c]ruising along at 55 mph on the highway, our cars easily cleared 40 mpg and, astonishingly, approached 50."  (RJN Exh. 4) ("Not only is it easy to achieve, it's easy to surpass, even under less than ideal conditions.").  Similarly, *Consumer Reports* achieved a 39 MPG highway result for the Elantra.  (RJN Exh. 5).  Most recently, *Car and Driver* reported 41 MPG highway during a test of the Elantra.  (RJN Exh. 6).

Receiving similar accolades, the Sonata was selected as the 2011 International Car of the Year.  (RJN Exh. 7).  *Consumer Reports* deemed the Sonata with a 2.4L engine as one of the best new cars under $25,000.  (RJN Exh. 8).  A *Consumer*

1  *Reports* test of the Sonata with a 2.4L engine achieved 39 MPG highway, RJN Exh.

2  9, which exceeds the EPA and advertised estimate by more than 10 percent.[8]

3          A consumer survey found that Elantra owners self-reported a combined MPG

4  estimate of 32.8 MPG (virtually identical to Hyundai's 33 MPG estimate); and 29

5  MPG for Sonata owners, which is *higher* than the 28 combined MPG set forth on

6  the EPA window sticker.  (*See* Expert Report of Dr. Itamar Simonson at ¶ 53).

7          **Plaintiffs Differ in the Sources of Information They Considered and the**

8  **Extent to Which They Saw the EPA Disclosures Before Purchase**.  Plaintiff

9  Daniel Baldeschi owns a 2012 Sonata.  (Morgan Decl. Exh. 1 (Baldeschi Tr.) 18:14-

10  18.  Thomas Ganim and Lillian Levoff respectively bought 2011 and 2012 Elantras.

11  *Id.* Exh. 2 (Ganim Tr.) at 23:9-23); *id.* Exh. 3 (Levoff Tr.) at 14:21-15:2.  All three

12  plaintiffs are long-time drivers and previous new car purchasers.  (*Id.* Exh. 3 (Levoff

13  Tr.) at 5:13-14 (20 years); *id.* Exh. 2 (Ganim Tr.) at 6:24-7:3 (26 years); *id.* Exh. 1

14  (Baldeschi Tr.) 7:5-19 (45 years)).

15          **Mr. Baldeschi**:  Mr. Baldeschi saw Sonata television ads promoting 35 MPG,

16  though he could not recall which specific ads.  (*Id.* Exh. 1 (Baldeschi Tr.) at 25:3-

17  22, 28:18-24).  He testified that, as to all the Hyundai advertising he saw, he always

18  understood the mileage figures *were* EPA-based estimates.  (*Id.* at 24:2-5 ("Q: [A]nd

19  when you saw any advertising about the Sonata, you assumed that those [mileage

20  figures] were done under EPA conditions, correct?  A: Yes"); *see also id.* at 22:20-

21

22  ───────────────

23          [8]  Although plaintiff Baldeschi purchased a 2012 Hyundai Sonata with a 2.4L

24  engine, plaintiffs seek to certify a class that includes the Sonata Turbo and Hybrid,

25  Notice  at ii.  The Sonata with a 2.4L engine, the Sonata Turbo, and the Sonata

26  Hybrid each have different EPA fuel economy estimates.  (RJN Exh. 10, 11,12).

27  These differences are in addition to the differences in mileage estimates for the 2011

28  Hyundai Sonata with a 2.4L engine depending on whether it has an automatic or a

   manual transmission.  (Nguyen Decl., Exhs. 3-4).

23:2).[9]  He also conducted his own Internet research and confirmed the advertised figures were EPA-based estimates.  (*Id.* at 32:18-33:3).  Further, he concedes he viewed the EPA window sticker indicating these were EPA mileage estimates before he bought his Sonata.  (*Id.* at 36:15-37:21).  Unlike the other plaintiffs, Mr. Baldeschi said he also relied significantly in making his purchase on oral representations by the salesperson concerning mileage.  (*Id.* at 37:22-39:15 (testifying that these representations were "a good part" of his purchase decision)).

**Mr. Ganim**:  Mr. Ganim saw various television commercials and billboards advertising 40 MPG for the Elantra.  (Morgan Decl. Exh. 2 (Ganim Tr.) at 24:6-19; 28:6-16).  He could not recall which specific commercials or billboards or the specific content.  (*Id.* at 24:6-19; 25:3-7).  He did recall seeing the "actual mileage may vary" disclosure in one or more Hyundai ads.  (*Id.* at 27:2-6).  He also concedes seeing the EPA window sticker, including mileage information, before purchase.  (*Id.* at 15:11-15; 33:5-19; *see also id.* at 54:12-55:18.).[10]

**Ms. Levoff**:  Ms. Levoff recalls viewing Elantra ads on television, the Internet, billboards, and magazines that made the 40 MPG representation.  (Morgan Decl. Exh. 3 (Levoff Tr.) at 17:5-20:24).  She couldn't recall if the ads she saw indicated these figures were EPA estimates or that actual mileage would vary.  (*Id.* at 18:4-23).  She also visited Hyundai's website, *id.* at 21:21-23:2, and conducted research from third-party sources, *id.* at 23:22-24:14.  She further claims she never saw any EPA MPG references during her research on more than eight different

---

[9]  Mr. Baldeschi later tried to say he believed the advertised figures were based on Hyundai testing.  In either event, he conceded that before purchase he learned from at least two sources that Hyundai was advertising EPA-based estimates. (Morgan Decl. Exh. 1 (Baldeschi Tr.) at 32:18-33:3; 36:15-37:21).

[10]  Significantly, Mr. Ganim also agreed the window sticker stated that "expected range for most drivers is 33 to 47" (highway).  (Morgan Decl. Exh. 2 (Ganim Tr.) at 59:8-20).  Mr. Ganim reported that he does achieve 33 MPH.  (*Id.* at 46:16-48:25).

models made by different manufacturers.  (*Id.* at 30:12-34:17 (various models by Honda, Toyota, VW, Nissan, Ford, and Chevrolet)).  She also contends (somewhat incredibly) that despite walking the sales lots for several brands of car and test driving numerous models, she never once read an EPA window sticker, including the one affixed to the Elantra she bought.  (*Id.* at 26:24-27:9; 31:20-32:19).

**No Plaintiff Deemed the EPA Disclosures Material.**  Each plaintiff understood fuel mileage will vary by driving conditions.  (Morgan Decl. Exh. 3 (Levoff Tr.) at 11:21-14:16; *id.* Exh. 2 (Ganim Tr.) at 17:20-18:7 (it's "common knowledge"); *id.* Exh. 1 (Baldeschi Tr.) at 19:24-21:17).  They further understood that a consumer would therefore need to know the test protocols to determine if the mileage estimates would be comparable to the particular conditions under which he or she drives.  (*See, e.g. id.* Exh. 1 (Baldeschi Tr.) at 26:13-23).  Yet to this day, none of the three named plaintiffs has any understanding about the conditions under which EPA mileage estimates are determined.  (*Id.* Exh. 3 (Levoff Tr.) at 38:24-39:17; *id.* Exh. 2 (Ganim Tr.) at 40:2-17; *id.* Exh. 1 (Baldeschi Tr.) at 23:8-25).

Plaintiffs Levoff and Ganim agreed that language that these were EPA estimates would have had ***no effect*** on their assessment of the MPG figures in Hyundai's ads.  (*Id.* Exh. 3 (Levoff Tr.) at 40:6-14 ("Q: [W]ould the phrase 'EPA' have changed anything about how you viewed the mileage figures? A: No"); *id.* Exh. 2 (Ganim Tr.) at 40:2-17 ("Q: So if an ad said 'This was an EPA estimate' that wouldn't give you any additional knowledge about how the mileage estimates were formulated?  A: No")).  Mr. Ganim added it was "not relevant" to him how Hyundai derived its mileage figures.  (*Id.* Exh. 2 (Ganim Tr.) at 26:13-27:1).

Mr. Baldeschi did say that he put stock in EPA-based MPG figures because they had the imprimatur of the government.  (Morgan Decl. Exh. 1 (Baldeschi Tr.) at 22:5-7 ("[W]hen I'm presented the fact that the vehicle's capable of this, as per EPA testing; EPA is Government, the Government's right, right?")).  But of course,

Mr. Baldeschi testified he *did* know from multiple sources, as well as his own assumptions, that these were EPA estimates, and bought his Sonata anyway.

Plaintiffs' responses were similar with respect to the "actual mileage may vary" disclosure.  Ms. Levoff contends she did not recall seeing that language in any of the advertising, *id.* Exh. 3 (Levoff Tr.) at 18:15-23, but testified that this additional language would not have changed her assessment of the mileage figures. (*Id.* Exh. 3 (Levoff Tr.) at 40:15-41:11.  Likewise, Mr. Baldeschi could not specifically recall reading the "actual mileage may vary" language on the window sticker (although he said "I'm sure that it was there"), but conceded it would have had no effect on his purchase decision.  (*Id.* Exh. 2 (Baldeschi Tr.) at 55:14-56:2). And Mr. Ganim admits he *did* see that language in Hyundai's advertising but continued with his Elantra purchase.  (*Id.* Exh. 3 (Ganim Tr.) at 27:2-6).

**Plaintiffs Differ in What They Believe MPG Figures Represent**. Two of the plaintiffs have an unusual subjective view of what MPG figures represent.  Both Ms. Levoff and Mr. Ganim believe that MPG figures (whether EPA-based or not) represent the minimum mileage that will be achieved, regardless of driving conditions.  Thus, both plaintiffs simply assumed that, even in consistent bumper-to-bumper traffic, they would achieve at least 29 MPG city and 40 MPG highway.  (*Id.* Exh. 2 (Ganim Tr.) at 21:5-20; 23:2-6; 26:2-7 (agreeing it was his understanding that he would achieve these mileages "even if your were on the 405, or the 5, stuck in traffic . . . ?"); *id.* Exh. 3 (Levoff Tr.) at 36:17-37:23).  Mr. Ganim admitted there was nothing in the Hyundai ads that suggested the 40 MPG would be a minimum, rather this was just his "personal assumption." (*Id.* Exh. 2 (Ganim Tr.) at 53:9-54:11).  Ms. Levoff testified similarly.  (*Id.* Exh. 3 (Levoff Tr.) 52:7-53:10 (this was her assumption for every manufacturer, not particular to Hyundai)).

By contrast, Mr. Baldeschi understood (correctly) that EPA-based estimates reflected what the car was capable of achieving under that particular test protocol. (Morgan Decl. Exh. 1 (Baldeschi Tr.) at 21:25-22:17).  He understood actual MPG

1  would fall within a range, and specific disclosures confirming that fact would not

2  have made any difference in his purchase decision.  (*Id.* at 54:18-55:2).

3      The survey evidence shows consumers generally have no consistent view of

4  what EPA-based MPG figures represent.  (*See* Simonson Report, ¶¶ 49-52.)

5                          <u>**Argument**</u>

6      Plaintiffs bear the burden to justify certification.  *Amchem Prods., Inc. v.*

7  *Windsor*, 521 U.S. 591, 614 (1997).  Courts routinely reject a "certify now and

8  worry later" approach.  "A party seeking class certification must affirmatively

9  demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.

10  Ct. 2541, 2551 (2011).  Pleadings are not proof, and courts must conduct a "rigorous

11  analysis" of the plaintiffs' showing.  *Id.*  Plaintiffs must meet each Rule 23

12  requirement by a preponderance of the evidence.  *In re Hydrogen Peroxide Antitrust*

13  *Litig.*, 552 F.3d 305, 320 (3d Cir. 2008); *Amchem,* 521 U.S. at, 614 (plaintiff must

14  meet *all* requirements of Rule 23(a) and (b)(3)).

15  I.   <u>**PLAINTIFFS CANNOT SHOW COMMON ISSUES PREDOMINATE**</u>

16      A.   <u>**Plaintiffs Bear the Burden to Demonstrate Commonality and that**</u>

17           <u>**Common Issues Predominate**</u>

18      The commonality requirement of Rule 23 requires a contention "capable of

19  classwide resolution—which means that determination of its truth or falsity will

20  resolve an issue that is central to the validity of each one of the claims in one

21  stroke." *Dukes*, 131 S. Ct. at 2551.  Specifically:

22      What matters to class certification . . . is not the raising of common
       'questions'—even in droves—but, rather the capacity of a classwide
23      proceeding to generate common *answers* apt to drive the resolution of
       the litigation.  Dissimilarities within the proposed class are what have
24      the potential to impede the generation of common answers.

25  *Id.* at 2551 (emphasis in original).  If "[d]issimilarities within the proposed class"

26  preclude class-wide resolution, they are fatal no matter how many similarities can be

27  identified.  *Id.*  Here, dissimilarities among class members preclude findings of

28  either commonality under Rule 23(a) or predominance under Rule 23(b)(3).

**B.** **Reliance/Causation Raise Individual Issues**

    1.   Many Consumers Would Not Have Seen the Challenged Ads

As plaintiffs concede, proof of reliance is generally required to obtain classwide relief. (Br. at 21:14-16).[11]  A threshold issue here—and one that defeats certification—is determining whether a given class member even saw one of the challenged ads.  *See, e.g., Cohen v. DirecTV, Inc.*, 178 Cal. App. 4th 966, 980-81 (2d Dist. 2009) (no certification of UCL claim due to individual questions of exposure to, and reliance on, false representations); *Pfizer Inc. v. Super. Ct.*, 182 Cal. App. 4th 622, 632 (2d Dist. 2010) (reversing certification because "large numbers of class members were never exposed to the [challenged advertising] . . . there is absolutely no likelihood they were deceived"); *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 925-26, 928 (4th Dist. 2010) (no UCL or FAL certification because most class members were "never exposed" to challenged statement).[12]

Here, plaintiffs cannot identify a single specific television, magazine, or Internet ad that included MPG figures unaccompanied by the EPA language.  With one exception, the named plaintiffs could not identify with any specificity which ads they did see, which precludes verifying whether those disclosures did appear. (Morgan Decl. Exh. 1 (Baldeschi Tr.) at 28:18-24; Exh. 2 (Ganim Tr.) at 24:6-19;

---

[11]   Plaintiffs' fraud, deceit, and CLRA claims require proof of actual reliance. *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993) (deceit requires actual reliance); *Panoutsopoulos v. Chambliss*, 157 Cal. App. 4th 297, 308 (1st Dist. 2007) (fraud); *Sateriale v. R.J. Reynolds Tobacco Co.*, --- F.3d ---, 2012 WL 4857215, at *12 (9th Cir. Oct. 15, 2012) (CLRA requires actual reliance). Similarly, both the UCL and Article III require proof of causation, *i.e.,* that the injury be "fairly traceable" to the defendants' conduct.  *See Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 327 (2011) (in amending the UCL to include the term injury-in-fact, the drafters "intended to incorporate the established federal meaning").

[12]   *Target* also rejected certification based on causation.  189 Cal. App. 4th at 929 ("class members" who "did not view the alleged misrepresentation" also "could not satisfy this causation element of the CLRA claim").

25:3-7; 28:6-16).  One plaintiff could not definitively say the disclosures did not appear, *id.*, Exh. 3 (Levoff Tr.) at 18:4-23; while another admits he did see the "actual mileage may vary" language, *id.* Exh. 2 (Ganim Tr.) at 27:2-6.  To the extent plaintiffs complain about the prominence of the disclosures in the ads, that adds further complications, because some consumers would have seen them while other might not.  Thus, class-defeating issues arise simply in trying to determine what ads were seen, what those ads said, and what portions consumers actually saw, heard, or read.

Plaintiffs attempt to avoid this hurdle by claiming their case falls within a narrow category of cases involving "pervasive and widespread misrepresentation." (Br. at 21:14-25 (citing cases)).  Of course, plaintiffs bear the burden at certification to justify a presumption that every consumer saw an ad that did not include the EPA disclosures or was otherwise misleading, and they have presented no survey, expert report, or other evidence that might warrant that presumption.  Courts have routinely rejected the notion of a presumption of exposure when ad campaigns ran for a limited time and there was no record evidence suggesting every class member was likely exposed to the offending advertising.  The decision in *Pfizer* is instructive:

> [A]lthough Pfizer ran four different television commercials with the "as effective as floss" campaign, the commercials did not run continuously and there is no evidence that a majority of Listerine consumers viewed any of those commercials.  Thus, perhaps the majority of class members who purchased Listerine during the pertinent six-month period did so not because of any exposure to Pfizer's allegedly deceptive conduct, but rather, because they were brand-loyal customers or for other reasons.

182 Cal. App. 4th at 631-32; *see also Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 595(9th Cir. 2012) ("[T]he misrepresentations at issue here do not justify a presumption of reliance.  This is so primarily because it is likely that many class members were never exposed to the allegedly misleading advertisements"); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (no predominance in UCL class action if "there was no cohesion among the members because they were

exposed to quite disparate information from various representatives of the defendant"); *Kaldenbach v. Mutual of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 849-50 (4th Dist. 2009) (no predominance on issue of causation where class members were not subject to uniform representations).

Nor do the authorities plaintiffs cite in any way suggest that Hyundai's 40 MPG campaign could conceivably amount to "pervasive and widespread misrepresentation" such that proof of individual reliance would not be required under the applicable law.  For example, *Commodity Futures Trading Comm'n v. White Pine Trust Corp.*, 2007 WL 1754819, at *1, 8 (S.D. Cal. Apr. 20, 2007)[13]—an uncontested default judgment proceeding—did not involve a consumer marketing campaign at all but rather the operation of a fictitious company designed to solicit and then misappropriate investments, where an inference of group reliance on the company's legitimacy was warranted.  *Federal Trade Comm'n v. Figgie Int'l, Inc.*, 994 F.2d 595, 600, 605 (9th Cir. 1993), cited in *White Pine Trust*, relied on Section 13 of the FTC Act rather than California statutory or common law, and in any event, concerned in-person, in-home sales pitches where every consumer was *necessarily* exposed to the alleged misstatements.

*Johnson v. General Mills, Inc.*, 275 F.R.D. 282, 288-89 (C.D. Cal. 2011) is also readily distinguishable.  *Johnson* involved a representation that *Yo-Plus* yogurt promoted digestive health that was present on every package label, which justified the presumption that every class member was exposed to the alleged misstatement.[14] *Id*.  And *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009), excused plaintiffs from pleading reliance on specific advertisements in the unique circumstance of a

---

[13]   Contrary to plaintiffs' citation (Br. at 21:16-17), there is no indication that *White Pine Trust* is intended for publication in any Federal Reporter.

[14]   Indeed, here the "label" that appeared on every vehicle—the EPA window sticker—indisputably contained all appropriate disclosures.

1   decades-long advertising campaign.  The advertisements here do not approach the

2   same kind of "pervasive," long-term campaign at issue in *Tobacco II*.  *Id.* at 308,

3   330 (plaintiffs alleged "a fraudulent course of conduct that [] spanned decades").

4          Unlike the consumers in *Johnson* or *Tobacco II*, plaintiffs here have not

5   offered any evidence that all, or even most, class members ever saw a single

6   Hyundai advertisement representing that the Elantra or Sonata obtained 40 MPG

7   without accompanying EPA disclosures.  Rather, the overwhelming evidence shows

8   Hyundai complied with all applicable regulations and disclosed to consumers that

9   40 MPG was an EPA highway estimate in all advertising that included an MPG

10  representation.  (*See supra* at 3:1-5:2).  In any event, even were plaintiffs'

11  allegations true, only *some* advertising was potentially actionable and only some

12  consumers would have seen that advertising before buying an Elantra or Sonata.

13          2.   Whether the Challenged Advertisements Misled Purchasers

14               Raises Individual Issues of Reliance and Causation

15          "[R]eliance on a misrepresentation made as part of a nationwide marketing

16  strategy cannot be the subject of general proof." *UFCW Local 1776 v. Eli Lilly and*

17  *Co.*, 620 F.3d 121, 133 (2d Cir. 2010) (quotation marks omitted); *In re Prempro*,

18  230 F.R.D. 555, 567 (E.D. Ark. 2005) ("Whether a plaintiff saw an advertisement;

19  whether the particular advertisement was fraudulent; whether that plaintiff relied on

20  the advertisements; and whether the plaintiff was damaged as a result of the

21  advertisement are all individual questions of fact.").

22          For example, even if Mr. Baldeschi saw a challenged ad (he was unable to

23  definitively say the disclosures were not present), he *always* understood the

24  advertised MPG was based on EPA estimates, a belief confirmed by his review of

25  Internet information and the EPA window sticker.  (Morgan Decl. Exh. 1 (Baldeschi

26  Tr.) at 22:20-23:2; 24:2-5; 32:18-33:3; 36:15-37:21, 53:14-54:9).  Similarly, Mr.

27  Ganim knew before purchase that the MPG estimates were EPA figures.  (Morgan

28  Decl. Exh. 2 (Ganim Tr.) at 15:11-16:11; 33:5-19).  Ms. Levoff, by contrast, formed

1   no opinion whether the stated mileage referred to EPA mileage estimates or some

2   other metric.  (*Id.* Exh. 3 (Levoff Tr.) at 38:17-23).  Notably, no plaintiff could

3   affirmatively testify that he or she understood the challenged MPG advertisements

4   to refer to anything other than EPA mileage estimates.  Where, as here, many

5   members of the class could *not* have been deceived because they fully understood

6   that the advertised MPG was an EPA mileage estimate, or formed no opinion

7   concerning whether it was EPA-based or not, individual issues of reliance and

8   causation plainly predominate and a class cannot be certified.

9                    3.     Materiality Raises Individual Issues

10          Plaintiffs' claims require proof of materiality (in addition to reliance and

11   causation).  *See Edwards v. Ford Motor Co.*, 2012 WL 2866424, at *9-10 (S.D. Cal.

12   June 12, 2012) (denying certification of CLRA claim; "materiality varies from

13   consumer to consumer," where evidence showed the plaintiff "did not research her

14   [car] ahead of time, did not seriously investigate the car on the date of her purchase,

15   and . . . essentially made her decision to purchase her car on the spot and without

16   express concern for safety issues").  As a Central District judge reasoned:

17           [I]f the issue of materiality or reliance is a matter that would vary from
             consumer to consumer, the issue is not subject to common proof, and
18           the action is properly not certified as a class action . . . .  Because [the]
             evidence establishes that awareness of a disclosure would almost
19           certainly vary from consumer to consumer, it shows that the element of
             reliance cannot be established by the reasonable consumer standard.
20

21   *Webb v. Carter's Inc.,* 272 F.R.D. 489, 502 (C.D. Cal. 2011) (Feess, J.).

22          Here, the named plaintiffs' own experiences confirm that materiality also

23   presents an individualized issue among class members.  Specifically, even assuming

24   plaintiffs Levoff and Ganim actually saw a challenged advertisement, they agreed

25   that language indicating these were EPA-based estimates would have had ***absolutely***

26   ***no effect*** on their assessment of the MPG figures in the Hyundai ads.  (Morgan

27   Decl. Exh. 3 (Levoff Tr.) at 40:6-14; *id.* Exh. 2 (Ganim Tr.) at 40:2-17).  Mr. Ganim

28   testified flat it was "not relevant" to him how Hyundai arrived at their mileage

figures. (*Id.* Exh. 2 (Ganim Tr.) at 26:13-27:1). The only named plaintiff who did value EPA-based mileage estimates over other estimates—Mr. Baldeschi—knew from multiple sources that these were EPA mileage estimates were and bought is Sonata anyway. (*Id.* Exh. 1 (Baldeschi Tr.) at 22:5-7; 22:20-23:2; 24:2-5, 32:18-33:3; 36:15-37:21; 37:22-38:22; 53:14-54:9).

Similarly, the named plaintiffs' reaction to Hyundai's disclosures that "actual mileage may vary" further confirm that whether the represented mileage estimate was an EPA estimate or not was immaterial to some, if not most, plaintiffs. Ms. Levoff contends she did not recall seeing the "actual mileage may vary" language in any of the advertising, Morgan Decl. Exh. 3 (Levoff Tr.) at 18:15-23, but testified that this additional language would not have changed her assessment of the mileage figures. (*Id.* at 40:15-41:11). Likewise, Mr. Baldeschi could not specifically recall reading the "actual mileage may vary" language on the window sticker (although he said "I'm sure that it was there"), but conceded it would have had no effect on his purchase decision. (*Id.* Exh. 1 (Baldeschi Tr.) at 55:14-56:2). And Mr. Ganim admits he *did* see that language in Hyundai's advertising but continued with his Elantra purchase. (*Id.* Exh. 2 (Ganim Tr.) at 27:2-6).

In addition, plaintiffs all conceded they understood fuel mileage would vary by driving conditions (notwithstanding whatever MPG advertisements they may have seen) (Morgan Decl. Exh. 3 (Levoff Tr.) at 11:21-14:16; *id.* Exh. 2 (Ganim Tr.) at 17:20-18:7; *id.* Exh. 1 (Baldeschi Tr.) at 19:24-21:17). Each named plaintiff also understood that a consumer would need to know the test protocols to determine if the mileage estimates would be comparable to the particular conditions under which he or she drives. (*See, e.g.*, *id.* Exh. 1 (Baldeschi Tr.) at 26:13-23). Nevertheless, not one plaintiff cared enough about fuel economy to investigate the testing conditions for the mileage estimates. (*Id.* Exh. 3 (Levoff Tr.) at 38:24-39:17; *id.* Exh. 2 (Ganim Tr.) at 40:2-17; *id.* Exh. 1 (Baldeschi Tr.) at 23:8-25).

The testimony of the named plaintiffs was confirmed by the only consumer survey conducted in this action, which showed that (i) EPA disclosures had no impact on consumer interpretation of MPG estimates (*see* Simonson Report, ¶¶ 38-43); and (ii) that of 15 tested sources of information that influence new car purchases, advertisements in any medium (television, print, Internet, billboards) ranked behind *every* other factor in terms of importance to consumers, (*id.* at ¶ 48).

## C.   <u>Plaintiffs Have Not Shown An Injury Common To All Class Members or A Reliable Damages Methodology</u>

To obtain certification, plaintiffs must present "a likely method for determining class damages." *Chavez v. Blue Sky Natural Beverage Co.,* 268 F.R.D. 365, 379 (N.D. Cal. 2010); *see also Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *6 (S.D.N.Y. Aug. 5, 2010) (consumer class action cannot be certified without reliable methodology for proving classwide damages).

Plaintiffs contend damages can be measured by determining a hypothetical price premium paid based on the difference between the EPA estimates and their actual mileage. (Espey Decl., ¶¶ 12-21). The most fundamental problem with this model is that it is based on the EPA vs. "real world" liability theory that the Court rejected at the motion to dismiss stage. Plaintiffs concede all Hyundai advertising they saw accurately reflected the EPA-based estimates. (Morgan Decl. Exh. 1 (Baldeschi Tr.) at 53:14-54:9; *id.* Exh. 2 (Ganim Tr.) at 34:1-14.) Plaintiffs cannot resurrect a barred legal theory via their damages approach.

Even taken on its own terms, Dr. Espey's theory is flawed and unreliable. These deficiencies are detailed in the report of Dr. Keith Ugone. Among other problems, plaintiffs' model ignores that most consumers pay less than full MSRP (Ugone Report, ¶¶ 14-18); it uses EPA mileage estimates rather than the MPG consumers actually expect (most understand mileage will vary from the EPA estimates) (¶¶ 19-21); consumers value fuel economy differently (¶¶ 22-25); it fails to account for varying consumer driving behavior that affects mileage (¶¶ 35, 48-

1  50); and it simply assumes no consumer saw the EPA disclosures, which is belied

2  plaintiffs' own testimony, defendant's consumer survey, and common sense (¶ 40).

3  A similar price premium theory was rejected in *Snapple,* where Dr. Ugone

4  was also an expert.  The *Snapple* court reasoned that the plaintiffs were required to

5  show they "paid more for Snapple beverages *as a result of* Snapple's 'All Natural'"

6  labeling," but "individualized inquiries as to causation, injury, and damages for each

7  of the millions of putative class members would predominate" such that plaintiffs

8  had not met their burden to provide a classwide damages methodology.   2010 WL

9  3119452, at *6.

10  Here, Dr. Ugone's report similarly demonstrates that no reliable method exists

11  to determine damages on a classwide basis.  Plaintiffs fail to acknowledge any of

12  these problems with classwide damages, causation, and actual injury, let alone

13  propose an approach to resolve them, which dooms their request for class treatment.

14  *See Dukes,* 131 S. Ct. at 2551 (2011) (no certification unless common issues can be

15  resolved "in one stroke").  And plaintiffs' insistence that *Tobacco II* relieves much of

16  their burden misses the mark.  *Tobacco II* was directed to the issue of standing for a

17  UCL action; the California Supreme Court made clear it was not addressing nor

18  changing the requirements for class certification (nor could that court alter federal

19  class action requirements).  46 Cal. App. at 314-22.[15]

20  **II.   THE NAMED PLAINTIFFS ARE NOT TYPICAL**

21  "The test of typicality 'is whether other members have the same or similar

22  injury, whether the action is based on conduct which is not unique to the named

---

24  [15]  Rule 23(b)(3) also requires a class action be "superior" to other methods of
25  adjudication.  "[W]hen the complexities of class action treatment outweigh the
benefits," class treatment is not superior.  *Zinser v. Accufix Research Inst., Inc.*, 253
26  F.3d 1180, 1192 (9th Cir. 2001) ( "If each class member has to litigate numerous
and substantial separate issues to establish his or her right to recover individually, a
27  class action is not 'superior.'").

28

plaintiffs, and whether other class members have been injured by the same course of conduct.'"  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *see also Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) ("The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class.").

The record here shows plaintiffs are anything but fair proxies for the proposed classes they seek to certify.  For example, plaintiffs Ganim and Baldeschi concede that they *knew* the MPG figures were EPA estimates before they bought their vehicles.  Plaintiffs Levoff and Ganim admit they found it completely immaterial to their purchase decision whether the Hyundai ads stated that these were EPA mileage estimates.  (Morgan Decl. Exh. 3 (Levoff Tr.) at 40:6-14; *id.* Exh. 2 (Ganim Tr.) at 40:2-17).   And Mr. Ganim admits he did see the "actual mileage may vary" disclosure in a Hyundai ad.  For these and other reasons discussed in connection with predominance, none of these named plaintiffs can be "typical" of a class of purportedly "deceived" consumers who (a) bought an Elantra or Sonata based on ads that allegedly did not contain an EPA reference, and (b) to whom that reference would have been material.[16]  *See, e.g., Gartin v. S & M NuTec LLC*, 245 F.R.D. 429, 434-35 (C.D. Cal. 2007) (plaintiff not typical where her experience differed in potentially outcome-determinative ways from other class members); *Sanchez v. Wal-Mart Stores, Inc.*, 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009) (plaintiff not typical because "[t]here are innumerable variations in the experiences and

---

[16]   The CLRA requires that the product be bought for "personal, family, or household purposes."  Cal. Civ. Code § 1761(d).  Yet Mr. Ganim admits he used his car primarily for business.  (Morgan Decl. Exh. 2 (Ganim Tr.) at 36:12-37:8).  Other class members surely did as well.  This fact precludes both typicality and predominance.  *See Carpenter v. BMW of N. Am., Inc.*, 1999 WL 415390 at *3 n.6 (E.D. Pa. June 21, 1999) ("individual inquiry will be required to determine which [purchasers use the goods] primarily for personal, family or household purposes")

1  information possessed by consumers, in the factors that influence consumers'
2  purchasing decisions, and in the manner by which consumers react to product
3  [disclosures]"), *reconsideration denied by* 2009 WL 2971553 (Sept. 11, 2009).

4  **III.   THE   VAST   PROPOSED   CLASSES   ARE   OVERBROAD   AND**
5  **VIOLATE ARTICLE III**

6      "'No class may be certified that contains members lacking Article III
7  standing.'"  *Mazza*, 666 F.3d at 594-95 (quoting *Denney v. Deutsche Bank AG*, 443
8  F.3d 253, 264 (2d Cir. 2006)).  A federal class must be "defined in such a way that
9  *anyone* within it would have standing," meaning they suffered an injury-in-fact
10 *caused* by the defendants' conduct.  *Id.* (emphasis added)*; see also Horne v. Flores*,
11 557 U.S. 433, 445 (2009) (Article III standing requires injury that is "concrete,
12 particularized . . . [and] fairly traceable to the defendant's challenged action").

13     Plaintiffs seek a free pass on standing issues based on the purported impact of
14 *Tobacco II*.  (Br. at 21:12-14.)   State law, however, cannot confer Article III
15 standing in *federal* court where none exists.  Thus, where a class definition includes
16 members who lack standing, it cannot be certified.  *See, e.g.*, *Avritt v. Reliastar Life*
17 *Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) ("[T]o the extent that *Tobacco II* holds
18 that a single injured plaintiff may bring a class action on behalf of a group of
19 individuals who may not have had a cause of action themselves, it is inconsistent
20 with the doctrine of standing as applied by federal courts."); *Webb*, 272 F.R.D. at
21 498 (Feess, J.) ("*Tobacco II* therefore does not persuade the Court that a class action
22 can proceed even where class members lack Article III standing.") (denying
23 certification of UCL, FAL, CLRA and fraud claims); *O'Shea v. Epson Am., Inc.,*
24 2011 WL 4352458, at *7-12 (C.D. Cal. Sept. 19, 2001) (Gutierrez, J.) (denying
25 certification where record showed some class members would likely lack Article III
26 standing); *Burdick v. Union Sec. Ins. Co.*, 2009 WL 4798873, at *4 & n.6 (C.D. Cal.
27 Dec. 9, 2009) (Collins, C.J.) ("[C]lass definitions should be tailored to exclude
28 putative class members who lack standing . . . [R]egardless of whether Plaintiffs

1  state a claim under the UCL or FAL, they must still establish the Article III standing
2  requirements . . . .").

3         Certification of plaintiffs' proposed classes would unquestionably violate
4  Article III, and the classes are otherwise impermissibly overbroad.  Plaintiffs seek to
5  certify an "Elantra Class" of "[a]ll purchasers and lessees of a 2011-12 model year
6  Hyundai Elantra who purchased or leased the vehicle in the United States" and a
7  "Sonata Class" of "[a]ll purchasers and lessees of a 2011-12 model year Hyundai
8  Sonata who purchased or leased the vehicle in the United States."  (Br. at 16:27-
9  17:3).  As this Court has already found, plaintiffs are limited to challenging MPG
10 statements without indicating those were EPA-based estimates (and there were no
11 such ads).  Thus, only those purchasers who reviewed such ads; did not see other
12 materials indicating those were EPA estimates (such as the brochure or window
13 sticker); found the EPA language material; and who did not achieve the stated
14 mileage, could have suffered any injury-in-fact.  All other purchasers in the putative
15 classes lack Article III standing.  *See also Oshana v. Coca-Cola Co.*, 472 F.3d 506,
16 514 (7th Cir. 2006) (even apart from Article III concerns, class was impermissibly
17 overbroad that contained class members who knew the true facts but bought the
18 product anyway); *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
19 2012 WL 1015806, at *6-11 (N.D. Ill. Mar. 22, 2012).

20 **IV.   PLAINTIFFS CANNOT JUSTIFY A NATIONWIDE CLASS**

21        The Court need go no further if it denies certification for the above reasons.
22 However, plaintiffs cannot meet their burden to establish California law should
23 apply to a nationwide class, as the Ninth Circuit recently concluded in a similar
24 class action against a California-based auto company in *Mazza,* 666 F.3d at 594.
25 (vacating certification order and holding that "each class member's consumer
26 protection claim should be governed by the consumer protection laws of the
27 jurisdiction in which the transaction took place").

28

Before applying one state's law, the Constitution requires a choice-of-law analysis.  *See, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985). California's "governmental interest" approach to conflict of law questions includes determining: (1) if other states' laws differ; (2) each jurisdiction's interest in applying its law; and (3) if a true conflict exists, identifying which state would be more impaired if its policy were subordinated.  *Mazza,* 666 F. 3d 589-90.

## A.   Applicable State Laws Vary Significantly

As held in *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002), state consumer laws "vary considerably."   "[C]ourts must respect these differences rather than apply one state's law to sales in other states with different rules." *Id.*; *see also In re HP Inkjet Printer Litig.*, 2008 WL 2949265, *7 (N.D. Cal. July 25, 2008) (no certification because of "the many differences among states with respect to, for example, statutes of limitations, scienter requirements, and calculation of damages"); *Mazza,* 666 F.3d at 591 (finding differences in scienter requirements and available remedies among state laws sufficiently material to create a true conflict).  These same material differences, as well as many others, are detailed in Hyundai's Appendix of Variations in State Laws.[17]

## B.   Each State Has an Interest In Applying Its Consumer Laws

"[E]very state has an interest in having its law applied to its resident claimants."  *Zinser*, 253 F.3d at 1187; *Mazza,* 666 F.3d at 592-93 (finding state interests in providing consumers the protections afforded by their states' laws "squarely implicated" by consumer class action against auto company); *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 314 (5th Cir. 2000) (all "51 relevant jurisdictions

---

[17]   These variations include the availability of a private right of action; the availability of a class action; whether actual reliance must be proved; statutes of limitations; liability standards; minimum and maximum recovery; entitlement to a jury trial; standing requirements; scienter requirements; and notice requirements.

1   are likely to be interested in ensuring that their consumers are adequately
2   compensated in cases of economic loss").

3       Against these state interests, plaintiffs contend that California law should
4   apply to the claims of 50 other jurisdictions' class member residents solely because
5   Hyundai's main U.S. office is in California and the Elantra and Sonata ad campaigns
6   "emanated from decisions made in HMA's California headquarters."  (Br. at 24:18-
7   24).  *Mazza* rejected this same argument, holding that because "communication of
8   the advertisements to the claimants and their reliance thereon in purchasing
9   vehicles—took place in the various foreign states," those states had a strong interest
10  in applying their own laws.  666 F.3d at 593-94.

11      **C.**   **Any California Interest In Applying Its Law Should Yield to Other**
12           **States**

13      The final step requires determining which state's interest would be more
14  impaired if its policy were subordinated.  *Washington Mut. Bank, FA v. Super. Ct.*,
15  24 Cal. 4th 906, 919-20 (2001).  This analysis does not assess "which conflicting
16  law manifest[s] the 'better' or the 'worthier' social policy" because "states are
17  empowered to mold their policies as they wish.'"  *Offshore Rental Co. v. Cont'l Oil
18  Co.*, 22 Cal. 3d 157, 165 (1978).  State consumer laws strike a different balance
19  between protecting residents and maintaining economic growth, and each state
20  undoubtedly views its laws as best.  Thus, "California has no greater interest in
21  protecting other states' consumers than other states have in protecting California's."
22  *Discover Bank v. Super. Ct.*, 134 Cal. App. 4th 886, 895 (2d Dist. 2005).
23  California's interests are fully served by allowing California residents to sue a
24  California company (and its Korean parent) under California law without
25  supplanting the equally considered policy judgments of 49 other jurisdictions.

26      The governmental interest analysis requires courts to consider "the history
27  and current status of the states' laws," and "the function and purpose of those laws."
28  *Washington Mut.*, 24 Cal. 4th at 920 (internal quotations omitted).  This analysis

reinforces the need to apply the law of each class member's state of purchase.  For example, the New Jersey Consumer Fraud Act, unlike the California statutes, permits recovery for treble damages.   N.J. Stat. Ann. § 56:8-19 (West 2012).  Similarly, New York's Consumer Protection Act has relaxed standing requirements that do not require pecuniary harm.  *Stutman v. Chem. Bank*, 731 N.E. 2d 608, 612 (N.Y. 2000).   The interests of these states will be "more impaired" if California statutes such as the CLRA are applied instead.   Conversely, the interests of states whose laws require scienter would be more impaired by imposing California's looser liability standards.   Other states' policy decisions on the amount and types of damages available, who may sue, and whether a class action device is available, and have a great interest in applying those rules where class members were allegedly misled and bought their vehicles.  *In Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 150 (S.D.N.Y. 2008) ("[T]he interests of the state of purchase would be most impaired if its consumer-fraud laws were not applied.").[18]

## Conclusion

For all of the foregoing reasons, Hyundai respectfully contends that plaintiffs' motion for class certification should be denied in its entirety.

---

[18]   Applying each state's law would defeat both predominance and superiority.  *See Zinser*, 253 F.3d at 1189 ("[W]here the applicable law derives from the law of the 50 states . . . differences in state law will compound the disparities among class members from the different states." (quotation marks omitted)); *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 653 (C.D. Cal. 1996) (denying certification due to "the problems and complexities raised by having to consider so many different state laws"); *In re Ford Motor Co. Ignition Switch Prods. Liability Litig.*, 174 F.R.D. 332, 349 ("[N]o federal court ha[s] tried a class action which would require the application of the laws of fifty-one jurisdictions.").

1    DATED: October 26, 2012          QUINN EMANUEL URQUHART &
2                                      SULLIVAN, LLP

3

4                                      By  /s/ Shon Morgan
5                                          Shon Morgan
                                           Attorneys for Defendant Hyundai Motor
6                                          America

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28