RICHARD D. McCUNE (#132124)
rdm@mccunewright.com
JAE (EDDIE) K. KIM (#236805)
jkk@mccunewright.com
ELAINE S. KUSEL (*Pro Hac Vice*)
esk@mccunewright.com
McCuneWright LLP
2068 Orange Tree Lane, Suite 216
Redlands, California  92374
Telephone:  (909) 557-1250
Facsimile:  (909) 557-1275

Attorneys for Plaintiffs LILLIAN E. LEVOFF, THOMAS GANIM,
DANIEL BALDESCHI, and Putative Class

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEHLIE R. ESPINOSA, LILLIAN  E. LEVOFF, THOMAS GANIM,  and DANIEL BALDESCHI, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>HYUNDAI MOTOR AMERICA; and DOES 1 through 10, inclusive,<br><br>          Defendants. | Case No.:  2:12-cv-00800 GW (FFMx)<br><br>**PLAINTIFFS' REPLY TO HYUNDAI'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Filed concurrently with Supporting Declarations; and Exhibits]<br><br>**Date:   November 29, 2012**<br>**Time:   8:30 am**<br>**Dept:   Courtroom 10**<br>**          Hon. George H. Wu**<br><br>Complaint Filed:  1/6/2012<br>First Amended Complaint Filed:  2/23/2012<br>Second Amended Complaint Filed:  8/2/2012 |

Plaintiffs Lillian E. Levoff, Thomas Ganim, and Dan Baldeschi ("Plaintiffs"), on behalf of themselves and all others similarly situated, hereby submit their reply to the Opposition to Plaintiffs' Motion for Class Certification filed by Defendant Hyundai Motor America ("Hyundai," "HMA," or "Defendant").

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ..................................................................................ii

I    PRELIMINARY STATEMENT ............................................................... 1

II   NEWLY RELEVANT FACTS ................................................................. 4

    A.    The Crux of Plaintiffs' Claims is That Hyundai Misrepresented MPG Rates 4

    B.    Defendant's Recent Public Admissions of Falsifying MPG Rates ................. 4

    C.    Defendant's Concealment of Falsified MPG Rates in Discovery ................. 5

III   ARGUMENT .......................................................................................... 6

    A.    Plaintiffs' Claims Encompass the False Advertising of Inflated MPG Rates  6

    B.    Plaintiffs' Claims Are Typical of Those of the Classes ............................... 10

        1.    Plaintiff Lillian Levoff ...................................................................... 10

        2.    Plaintiff Thomas Ganim ..................................................................... 11

        3.    Plaintiff Dan Baldeschi ...................................................................... 11

    C.    Plaintiffs Established That Common Issues Predominate Individual Issues 11

        1.    Class-Wide Exposure Is Established By Hyundai's Pervasive, Multi-Year Advertising Campaign, All of Which Include the Inflated MPG Rates ............................................................................................... 12

        2.    Materiality, Reliance, and Causation Are Subject to Class-Wide Proof .................................................................................................. 14

        3.    Properly Conducted Survey Research May Be Used to Establish Class-Wide Issues ............................................................................. 16

    D.    Plaintiffs Have Demonstrated That There Is a Reliable Damages Methodology ...................................................................................... 20

    E.    The Proposed Classes Comport With Article III ......................................... 23

    F.    California Law Should Apply to Claims of All Class Members ................... 24

IV   CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

**Federal Cases**

*Bates v. United Parcel Serv., Inc.*,
  511 F.3d 974 (9th Cir. 2007) ....................................................................24

*Edwards v. Ford Motor Co.*,
  2012 WL 2866424 (S.D. Cal. June 12, 2012) ............................................16

*F.T.C. v. Commerce Planet, Inc.*,
  8:09-CV-01324-CJC, 2012 WL 2930418 (C.D. Cal. June 22, 2012) ...........9

*F.T.C. v. Cyberspace.com, LLC*,
  453 F.3d 1196 (9th Cir. 2006) .....................................................................9

*F.T.C. v. John Beck Amazing Profits, LLC*,
  865 F. Supp. 2d 1052 (C.D. Cal. 2012) .......................................................9

*Fleming v. Pickard*,
  581 F.3d 922 n. 3 (9th Cir. 2009) ..............................................................24

*FTC v. Gill*,
  265 F.3d 944 (9th Cir. 2001) .......................................................................8

*FTC v. Pantron I Corp.*,
  33 F.3d 1088 (9th Cir. 1994) .......................................................................8

*Guido v. L'Oreal, USA, Inc.*,
  2012 WL 1616912 (C.D. Cal. 2012) ..........................................................16

*In In re POM Wonderful LLC Mktg. & Sales Practices Litig., ML*,
  10-02199 DDP RZX, 2012 WL 4490860 (C.D. Cal. Sept. 28, 2012).......13, 14, 24, 25

*In re Apple, AT & T iPad Unlimited Data Plan Litigation*,
  2012 WL 2428248 (N.D. Cal. June 26, 2012)................................14, 16, 25

*In re Prempro*,
  230 FRD 555 (E.D. Ark. 2005) ...........................................................15, 16

*Krueger v. Wyeth, Inc.*,
  2011 WL 8971449 (S.D. Cal. March 30, 2011) .....................................14, 16

*Mazza v. American Honda Motor Co., Inc.*,
  666 F.3d 581 (9th Cir. 2012) ...............................................................12, 14

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) .............................................................14, 24

*UFCW Local 1776 v. Eli Lilly and Co.*,
  620 F.3d 121 (2d Cir. 2010) ...................................................................15

*Webb v. Carter's Inc.*,
  272 F.R.D. 489 (C.D. Cal. 2011)............................................................16

*Wiener v. Dannon Co., Inc.*,
  255 F.R.D. 658 (C.D. Cal. 2009)............................................................16

**State Cases**

*Cohen v. DIRECTV, Inc.*,
  178 Cal.App.4th 966 & n.3 (2d Dist. 2009) .............................................13

*In re Tobacco II*,
  46 Cal.4th 298, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009)................................12, 15, 16

*Kaldenbach v. Mutual Omaha Life Ins. Co.*,
  178 Cal. App. 4th 830 (4th Dist. 2009) .....................................................14

*Pfizer Inc. v. Super. Ct.*,
  182 Cal. App. 4th 622 (2d Dist. 2010) .......................................................13

*Sevidal v. Target Corp.*,
  189 Cal.App.4th 905 (4th Dist. 2010) .......................................................13

*Wash. Mut. Bank v. Superior Court*,
  24 Cal.4th 906 (2001) ...............................................................................24

**Federal Rules**

Federal Rules of Evidence 702 ......................................................................17, 19

Federal Rules of Civil Procedure 30(B)(6)........................................................6

**Federal Regulations**

16 C.F.R. § 259.1 .............................................................................................7

16 C.F.R. § 259.2 .............................................................................................7

40 C.F.R. § 600.209-85....................................................................................7

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I**

**PRELIMINARY STATEMENT**

Hyundai's brief in opposition to class certification, like its motion to dismiss and the advertisements at issue here, is yet another carefully worded document designed to mislead.  Throughout the brief, each time Hyundai refers to the advertised fuel mileage figures in question, it refers to them as "EPA mileage estimates," "EPA-based," and states that "Hyundai's advertised mileage was identical to EPA-based estimates."  Likewise, in its motion to dismiss, Hyundai referred to the 2012 Hyundai Elantra as "an award winning fuel-efficient vehicle **that achieves 40 mpg/highway under the EPA protocol**" and described the estimated miles per gallon as "federally-mandated EPA results."  Also in that motion, Hyundai argued that plaintiff's disagreement was with the EPA, and not with "**responsible automakers such as Hyundai that accurately report fuel efficiency in the precise manner required by federal law.**"

We now know that each of the statements referenced above is either misleading or patently false.  The city and highway MPG figures contained in HMA's advertising were not generated by the EPA or "EPA based" but rather created by Hyundai.[1]  In addition, the Elantra did not achieve 40 mpg under the EPA protocol and Hyundai did not "accurately report fuel efficiency in the precise manner required by federal law."[2]  Rather

---

[1] The fact that Hyundai misled the plaintiffs and the Court as to the source of the MPG estimates is clear from the record.  (*See* Tentative Ruling on Motion to Dismiss at I ("The **EPA is mandated to test vehicles and provide to manufacturers** an estimated MPG which manufacturers are then mandated to display via a window sticker " and "The **EPA has estimated** that the Elantra achieves 40 MPG.") (emphasis added).)

[2] On November 2, 2012, Hyundai admitted that the EPA estimated mileage for the 2011, 2012 and 2013 Elantra among other vehicles was overstated.  The Company admitted that none of these vehicles actually achieved the purported class leading 40 MPG highway, but instead topped out at figures in-line with competitors' estimated MPGs.  As part of the disclosure, the mileage for both the 2011 and 2012 Elantra was reduced from a 29 city/40 hwy EPA fuel efficiency rating to 28 city/38 hwy.

-1-

than correct the record, disclose the true source of the MPG estimates, and inform the Court that the EPA was investigating this very issue and would announce – **within a week after the filing of their opposition brief** – that Hyundai had been found to have overstated the fuel economy of the Elantra, Hyundai has chosen to remain silent as to – and indeed conceal – these issues.  The reason seems clear.

As the court stated in its decision on Defendant's motion to dismiss

> to the extent that Plaintiff alleges Hyundai's noncompliance with the federal regulations as to the EPA Estimate and the disclosures that must accompany it, Plaintiff's claim that that such activities are "unlawful" within the meaning of the UCL are not preempted.

This is precisely the nature of Plaintiffs claims:  **Hyundai's advertised mileage figures were falsely inflated and were not presented in a manner consistent with EPA procedures, regulations and guidance.**  This is a false advertising case.  However, not once in its opposition brief to Plaintiffs' motion for class certification does Hyundai argue that its uniform MPG representations were *true*.  Moreover, Hyundai is unable to refute Plaintiffs' contention that consumers consider fuel economy in purchasing decisions and will pay more for a vehicle that gets better MPG.  These undisputed facts render issues of exposure to, reliance on, and materiality of the false MPG representations capable of class wide proof, thereby defeating Hyundai's challenges to the predominance of common issues requirement for class certification.

In addition, Hyundai did not and could not refute these facts as they relate to the named Plaintiffs' claims, which are entirely typical of those of the putative class:  Plaintiffs Lillian Levoff, Thomas Ganim, and Dan Baldeschi all viewed inflated MPG representations in Hyundai's widely disseminated advertisements, relied on that representation in making their purchases, and ultimately received MPG rates far below the advertised rates.  Instead, Hyundai futilely focuses its challenge to the typicality requirement as to whether certain EPA disclosures were viewed and relied on by Plaintiffs.  But this challenge entirely misses the mark – it is the inflated advertised MPG

rate itself that is the false advertisement, and these false statements cannot be cured by purported EPA disclosures which Hyundai has now admitted themselves were false and not sanctioned by the EPA.

Nevertheless, Hyundai continues to erroneously emphasize that this case is solely about EPA disclosures, a misdirection that is perhaps most evident from the failings of the survey conducted by its expert Dr. Itamar Simonson.  As thoroughly impeached by the report of Plaintiffs' survey expert, Dr. Jon Krosnick, Dr. Simonson's survey fails to achieve scientific validity and cannot be relied upon by the Court for numerous reasons, including the fact that he examined the wrong population, failed to start with the necessary first step of using a random sample, imposed bias through financial incentives, and provided misleading data regarding the number of participants, and thus the statistical significance of the result.  Moreover, the survey failed to show actual advertisements, showed a manipulated version of Hyundai's website, and did not ask the relevant questions, such as whether consumers consider MPG rates in purchasing decisions and whether consumers would pay less money for vehicles with lower MPG rates than advertised.

The report of Hyundai's damages expert, Dr. Keith Ugone, fares no better. Without having any expertise in the area of consumer valuation of fuel economy, Dr. Ugone ineffectually attempts to attack Plaintiffs' damages expert Dr. Molly Espey's peer-reviewed methodology in this field.

With respect to Article III standing, Hyundai incorrectly asserts that standing must be established for every putative class member, but this argument has been rejected by numerous Ninth Circuit Courts.  Finally, Plaintiffs have submitted evidence that California has the greatest interest in applying its laws to the claims of putative class members throughout the country because Hyundai is based in California, all of the challenged marketing decisions were made in California, Hyundai sells the greatest number of its vehicles in California as compared to any other state, and the decisions and publication of the recent admission of advertising falsely inflated MPG rates were made

in California.  Defendant has not met its burden to show that the law of California should not apply here.  Therefore, the certification of a nationwide class under California law is appropriate and manageable.

Plaintiffs, therefore, respectfully request that the Court certify the Classes defined in Plaintiffs' Motion For Class Certification, and appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel.

## II

## NEWLY RELEVANT FACTS

**A.   The Crux of Plaintiffs' Claims Is That Hyundai Misrepresented MPG Rates**

The crux of Plaintiffs' claims is that Hyundai misrepresented the MPG rates of its vehicles, including the 2011-12 Elantra and Sonata.  (*See generally* Second Amended Complaint, Dkt. 40.)  The Court's August 1, 2012, Order (Dkt. 39), set a September 16, 2012, deadline for Plaintiffs to file a motion for class certification, an October 26, 2012, deadline for Defendant to file its opposition to Plaintiffs' motion for class certification, a deadline of November 16, 2012, for Plaintiffs to file a reply in support of their motion for class certification, and a hearing date of November 29, 2012, for Plaintiffs' motion for class certification.  On, September 14, 2012, Plaintiffs filed a motion to certify these claims as a class action.  (Dkt. 43.)

On October 26, 2012, Defendant filed its opposition to Plaintiffs' motion for class certification ("Opposition Brief," Dkt. 58), wherein it asserted that its MPG representations in advertisements were neither false nor misleading because "Hyundai's advertised mileage was identical to EPA-based estimates," (*id.* at 3), and that "Hyundai's advertised mileage figures were consistent with the federal mandate that all auto manufacturers attach in a prominent place on all new automobiles labels that disclose, among other things, the fuel economy based on EPA testing protocols and estimated annual fuel cost," (*id.* at 5).

**B.   Defendant's Recent Public Admissions of Falsifying MPG Rates**

On November 2, 2012, – a week after Hyundai filed its opposition brief to

Plaintiffs' Motion for Class Certification – Hyundai issued a public statement and launched a website wherein it admitted that:

> Hyundai Motor America and Kia Motors America today announced that, following discussions with the U.S. Environmental Protection Agency (EPA), they are voluntarily adjusting the fuel economy ratings for approximately 900,000, or 35 percent of, 2011-13 model year vehicles sold through October 31, 2012.
>
> Procedural errors at the automakers' joint testing operations in Korea led to incorrect fuel economy ratings for select vehicle lines. As part of Hyundai/Kia's corrective actions, the fuel economy ratings for vehicles currently in showrooms are being voluntarily relabeled. With these changes, the 2012 Hyundai/Kia fleet fuel economy level is reduced by an average of 3 percent – from 27 to 26 MPG.
>
> "I sincerely apologize to all affected Hyundai and Kia customers, and I regret these errors occurred," said Dr. W. C. Yang, chief technology officer of Hyundai/Kia research and development. "Following up on the EPA's audit results, we have taken immediate action to make the necessary rating changes and process corrections."

(Decl. of Richard D. McCune in Support of Pls.' Reply to Hyundai's Opp'n to Mot. for Class Certification ("McCune Decl."), ¶2, Ex. 1.)  These admissions involve the 2011-12 Elantra at issue in this case.   (McCune Decl., ¶3, Ex. 2.)  Defendant also states that it will provide monetary relief for everyone who has owned one of these vehicles:  "Hyundai is putting in place a comprehensive reimbursement program for affected current and former vehicle owners to cover the additional fuel costs associated with our rating change." (McCune Decl., ¶4, Ex. 3.)

**C.**   **Defendant's Concealment of Falsified MPG Rates in Discovery**

On April 6, 2012 – seven months ago – Plaintiffs propounded written requests for production seeking, among others, "all DOCUMENTS that refer or reflect communication between Hyundai and the EPA regarding mpg testing or test conditions of the Hyundai Elantra form 2005 to the present."  (Pls.' Req. for Produc. of Docs.

Propounded to Def. Hyundai Motor America, Set One, Req. No. 17, attached to McCune Decl., ¶5; Ex. 4.)  On or about May 10, 2012, Defendant responded to this request with numerous objections, and despite producing documents on a rolling basis as late as October 25, 2012, failed to produce any documents relating to the EPA's investigation and retesting of its vehicles that was revealed with the recent public admissions. (McCune Decl., ¶6.)  Defendant also failed to produce the documents in its Rule 26 initial disclosures served on May 16, 2012.  (McCune Decl., ¶7.)

Based on these recent admissions, on November 5, 2012, Plaintiffs attempted to meet and confer regarding Defendant's production of such documents as well as to conduct a Rule 30(b)(6) deposition regarding this matter, but on November 7, 2012, Defendant expressed its refusal to comply.  (McCune Decl., at ¶8; Ex. 5 (Email string of counsel).)  On November 7, 2012, Plaintiffs also served their Notice of Deposition to Defendant Hyundai Motor America Pursuant to Rule 30(B)(6) of the Federal Rules of Civil Procedure, for topics relating to Defendant's Program to Adjust Fuel Economy Ratings, including the EPA's investigation and testing of its vehicles, Defendant's discovery of its inflated MPG rates that were represented to all purchasers of vehicles, as well Defendant's plan to provide reimbursement to the entire class of consumers who owned the affected vehicles.  (McCune Decl., ¶9; Ex. 6.)  Hyundai did not produce such a witness.  (McCune Decl., ¶10.)

### III

### ARGUMENT

**A.    Plaintiffs' Claims Encompass the False Advertising of Inflated MPG Rates**

In its opposition brief, Hyundai erroneously argues that Plaintiffs' claims are limited because Hyundai's advertisements are protected by federal regulations, but the court stated in its decision on Defendant's motion to dismiss that Plaintiffs' claims are much broader:

> to the extent that Plaintiff alleges Hyundai's noncompliance
> with the federal regulations as to the EPA Estimate and the
> disclosures that must accompany it, Plaintiff's claims that such

-6-

activities are "unlawful" within the meaning of the UCL are not
preempted.

(Mot. to Dismiss Order, April 23, 2012 (Dkt. 27), at 2-3.)

EPA regulations prohibit auto manufacturers from making representations in
advertising concerning the fuel economy of new vehicles *except* in certain circumstances.
The most basic of these is that the estimated MPG, whether city or highway, be
determined in accordance with the city or highway test procedure employed and
published by the U.S. Environmental Protection Agency as described in 40 CFR
§ 600.209–85 . . . as measured, reported, published, or accepted by the U.S.
Environmental Protection Agency.  16 C.F.R. § 259.1

Hyundai's reported MPG, by its own admission was not determined in accordance
with EPA procedures, and has been explicitly rejected by the EPA.  In addition, despite
Defendant's baseless contention to contrary, the FTC fuel economy guides clearly require
both an audio and video disclosure for EPA estimates.  The plain language of the
regulation states, "For television, if the estimated mpg appears in the video, the disclosure
must appear in the video; if the estimated mpg is audio, the disclosure must be audio." 16
C.F.R. § 259.2 n.5  Thus, Hyundai's advertising at issue in this case is violative of FTC
regulations[3] and not entitled to any deference as government approved or insulation from
liability under federal preemption.

This is a false advertising case.  Plaintiffs allege that Hyundai launched a pervasive
ad campaign that consisted of, among other things, TV ads that referred to the Elantra as
"the 40 MPG Elantra," and claimed that four Hyundai model's got 40 MPG ("4 Models
40 MPG") and print ads that stated, "40 MPG standard every model" and "Every Elantra
gets 40 MPG" when in fact the Elantra did not get 40 MPG.  Plaintiffs also allege that

---

[3]Contrary to Defendant's assertion, Plaintiffs have not and will not "concede" that the
mileage estimates Hyundai advertised for the Elantra and Sonata are the same as the
estimates based on EPA test protocols.  To the contrary, Hyundai has now "conceded"
that the 40 MPG highway estimate for the Elantra and the 35 MPG highway estimate for
the Sonata were not derived from testing done in accordance with EPA test protocols.

Hyundai advertised the Sonata as getting 35 MPG, though this was also untrue.  (The challenged advertisements are set forth in great detail in Pls.' Mot. for Class Certification ("Mot.") (Dkt. 43), at 1-16.)  Tellingly, in its opposition brief, Hyundai does not argue that the ads in question were true, or discuss the substance of the ads.  Even Defendant's expert, Dr. Simonson, who purports to address the question of whether class members could be misled by Hyundai's advertisements, did not use one actual Hyundai ad, or anything resembling these ads, in his study.  Instead he used copies of web pages for the 2013 Elantra and Sonata (neither page is at issue in this case) *which have been altered to change the way the disclosures appear*.[4]  It is difficult to understand how a study using these documents could have any relevance to the claims here.

Rather than address the substance of the ads, Hyundai argues that all ads contained disclosures which somehow inoculate them from liability.  This argument is without merit.  At its core, Hyundai's argument is really that the Company can make any statement it wants in its advertising so long as the ad also contains a disclosure that includes EPA estimates and the statement that actual mileage may vary.  This is not what the law says.  "Advertisers cannot use fine print to contradict other statements in an ad." *Cliffdale Associates, Inc.* 103 F.T.C.110, 180-81 (1984).  As the Ninth Circuit has explained, an advertising practice falls within the prohibition of deceptive acts or practices in or effecting commerce (1) if it is likely to mislead consumers acting reasonably under the circumstances (2) in a way that is material.  *FTC v. Gill,* 265 F.3d 944, 950 (9th Cir. 2001) (citing *FTC v. Pantron I Corp.,* 33 F.3d 1088, 1095 (9th Cir. 1994)).  A misleading impression is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."

---

[4] In the actual web pages for the vehicles, there is no disclosure of the source of the MPG claim, just a footnote next to the MPG number.  The footnote is not explained at the bottom of the page, but rather requires that a consumer click on the button that says "legal" at the bottom right of the page to reach the disclosure as to the source of the MPG claim.

1   *F.T.C. v. Cyberspace.com, LLC,* 453 F.3d 1196, 1201 (9th Cir. 2006) (citation and quotes

2   omitted); *F.T.C. v. Commerce Planet, Inc.*, 8:09-CV-01324-CJC, 2012 WL 2930418, at

3   *8 (C.D. Cal. June 22, 2012). Deception may not be sufficiently cured merely by the

4   inclusion of disclaimers in small print.  *Cyberspace.com,* 453 F.3d at 1200; *F.T.C. v.*

5   *John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012).

6         Moreover, even if disclosures alone were sufficient to inoculate a false or

7   misleading ad, the disclosures in this case would not have been sufficient to correct the

8   inaccurate information in the main text of the ads.  As is clear from the copies of the

9   advertisements **submitted by Hyundai**, the only disclosures in the ads were momentary

10   flashes in television ads, included in fine print which was illegible, or available only on a

11   different page which could only be reached by clicking a button marked "legal."[5]  A

12   hyperlinked page containing disclosures is inadequate to overcome the main

13   advertisement's net impression.  *Commerce Planet, Inc.*, 2012 WL 2930418 (C.D. Cal.

14   June 22, 2012).  In *Commerce Planet*, the court found that an advertisement in which the

15   disclosure was contained in a hyperlink buried at the bottom and not placed in close

16   proximity to the alleged misstatement made it unlikely that consumers would notice or

17   click on the link was facially misleading.  *Id.11* [6]

18

19   _____

20   [5] Defendant's contention that Plaintiffs have attempted to mislead the court by presenting advertisements in unsuitable forms is misplaced.  It is Plaintiffs' contention that the

21   advertisements were misleading in their published form.  Moreover, it is Defendant's presentation of its own television advertisements which is misleading because rather than

22   present the entire ad, they present only the image of a purported disclosure which appeared on the screen for one second.

23   [6] With respect to the internet advertisements, Defendant's reliance on *Kim v. Gen.*

24   *Motors, LLC* is misplaced. The court found that the fact that EPA disclosures appeared in footnotes was not enough to make an advertisement false or misleading.  (*Kim* at 13.)

25   The facts here are inapposite. Here, there are no footnotes.  Instead there is a small box

26   that says "legal."  If a consumer clicked on this button, they would be taken to a page

27   with an EPA estimates disclosure. However, there is no indication on the main advertising page that the legal button has anything to do with the MPG issue, and no

28   indication that Hyundai is making any qualification as to the 40 MPG claim.

Moreover, even if they had been seen, all of Hyundai's "disclosures" contained inaccurate information which did nothing to correct the false statements in the ads: The disclosures only provided Hyundai's inaccurate calculated fuel economy estimates which were not determined in accordance with the city or highway test procedure employed and published by the EPA.  Thus, they do nothing to correct the record, and only re-confirm the inflated, advertised MPG rate.

**B.    Plaintiffs' Claims Are Typical of Those of the Classes**

Hyundai asserts that Plaintiffs' claims are not typical of those of the respective classes based on exposure to and materiality of EPA disclosures.  But this entirely misses the crux of Plaintiffs' claims, which actually relate to the fact that Hyundai misrepresented that the Elantra would achieve 40 MPG and the Sonata 35 MPG, when in fact they fall far short of those representations.  As discussed above, no disclosures could have cured Defendant's representations and even if they could, the disclosures which plaintiffs allege were not present or legible in the ads were themselves false.  Plaintiffs' claims are entirely typical of the claims of all putative class members based on the following facts.

**1.  Plaintiff Lillian Levoff**

Plaintiff Lillian Levoff testified that she saw numerous Hyundai TV ads that state that the Elantra got 40 MPG.  (McCune Decl. ¶11; Ex. 7-Dep. Tr. of Levoff at 16:6-18:14.)  She also testified that she saw Elantra billboards, online banner ads, internet TV commercials, and ads in magazines that all stated that the Elantra got 40 MPG.  (*Id.* at 19:10-21:16.)  She testified that these ads said 40 MPG over and over again, sometimes along with "standard" and "no asterisk."  (*Id.* at 61:23-63:15.)  Ms. Levoff also testified that she relied on these ads in making her purchase of an Elantra, when researching what vehicle to purchase she considered gas mileage compared to purchase price.  (*Id.* at 32:24-33:7.)  "Those ads of 40 MPG played huge role in purchasing decision."  (*Id.* at 63:16-19.)

### 2.  Plaintiff Thomas Ganim

Plaintiff Ganim testified that he saw Hyundai TV commercials on Inside the NBA program on TNT network and the 40MPG message is what struck.  (McCune Decl. ¶12; Ex.8-Dep. Tr. of Ganim at 24:6-17.)   In addition, Mr. Ganim testified that he saw billboards that said 40 mpg.  (*Id.* at 28:4-16.)  Mr.Ganim also testified that the fact that the message that the Elantra got 40 mpg was what stuck because his new drive required more driving and took pay cut, so cost of gas was important – "was the Number 1 consideration, for me, for buying that car."  (*Id.* at 25:8-20.)  When he tracked his gas mileage on single highway driving events, he repeatedly got 33 MPG, not 40 MPG, and therefore overpaid for his vehicle.  (*Id.* at 46:7-49:19, 62:21-63:6.)

### 3.  Plaintiff Dan Baldeschi

Plaintiff Dan Baldeschi testified that he saw several ads including internet ads that stated that the Sonata got 35 MPG.  (McCune Decl. ¶13; Ex. 9-Dep. Tr. of Baldeschi at 31:4-22, 25:8-22.)  He testified that Hyundai's commercials put the "35 MPG" Sonata message right in your face, right on the screen.  (*Id.* at 28:25-29:23.)  He also testified that he had been "inundated with the 35 MPG" message for the Sonata," so he already believed his vehicle is capable of 35 [MPG].  (*Id.* at 33:7-34:7.)  Mr. Baldeschi testified that he chose to buy a Sonata because 35 MPG met his needs, compared to other models. (*Id.* at 19:8-19.)  Because each Plaintiff saw the misleading MPG advertisements, relied on them, and got substantially lower MPG rates, their claims are typical of those of the Classes.

## C.   Plaintiffs Established That Common Issues Predominate Individual Issues

Plaintiffs have demonstrated that there are common questions, including whether Hyundai disseminated advertisements for the 2011 and 2012 Elantra and Sonata models which made false and or misleading statements regarding the vehicles fuel economy; whether these ads were violative of FTC regulations, including those governing fuel economy claims; whether such ads were materially misleading; and whether Plaintiffs suffered damages as a result.

1    **1.     Class-Wide Exposure Is Established By Hyundai's Pervasive, Multi-**
2    **Year Advertising Campaign, All of Which Include the Inflated MPG**
3    **Rates**

4    Hyundai argues that common issues of fact do not predominate because this case
5    necessarily involves an individualized determination as to whether class members were
6    exposed to misleading advertisements and whether they relied on those advertisements in
7    purchasing Hyundai vehicles.  This is incorrect.  Under California's UCL, restitution is
8    available to absent class members without individualized proof of deception, reliance, or
9    injury.  *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 595 (9th Cir. 2012)
10   (quoting *In re Tobacco II,* 46 Cal.4th 298, 320, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009).

11   Defendant focuses a great deal of space on the red herring argument that Plaintiffs
12   could not identify which ads had EPA language.  This argument is specious.  Once again,
13   this case is about the affirmative misrepresentations in the ads, not disclosures that may
14   or may not have been appended to the ads and which may or may not have been legible.
15   That Plaintiffs absorbed the messages of the ads is clear from their testimony.  In truth,
16   the fact that Plaintiffs could not recall seeing the EPA disclosure language supports the
17   proposition that the ads were misleading, rather than weakening it.

18   Plaintiffs have presented evidence that Hyundai carried out a massive advertising
19   campaign, costing more than $100 million centered on the message that the Elantra got
20   40 MPG and that the Sonata got 35 MPG without qualification.  These ads ran across all
21   media, including, billboards, print advertisements and were in heavy circulation during
22   the class period, appearing among other places on the three most watched television
23   programs of the year, the NFL play offs, the Super Bowl, and the Academy Awards.  The
24   evidence also shows that the ad campaign dramatically increased traffic on Hyundai.com
25   and that there was a corresponding increase in Elantra sales coincident with the launch of
26   the ad campaign.  (Mot. (Dkt. 43), pp. 1-16.)  Thus, Defendant's reliance on *Pfizer* for the
27   contention that Hyundai's ad campaign was not pervasive is misplaced, as the facts there
28   are inapposite.  There, the challenged commercials did not run continuously and there

was no evidence that the ads message had an impact on sales. *Pfizer Inc. v. Super. Ct.,* 182 Cal. App. 4th 622, 631-32 (2d Dist. 2010).[7]

Facts virtually identical to those here were found to satisfy the predominance test in a very recent case in this district. In *In re POM Wonderful LLC Mktg. & Sales Practices Litig.*, ML 10-02199 DDP RZX, 2012 WL 4490860 (C.D. Cal. Sept. 28, 2012), the plaintiffs alleged that a maker of pomegranate juice disseminated a false and misleading message that pomegranate juice had special benefits relating to diseases and health-related conditions.  In opposing class certification, defendant Pom argued that common questions of fact did not predominate because 1) Pom disseminated several different advertisements, 2) class members may or may not have relied on the various advertisements, 3) class members bought Pom products for different reasons, and 4) class members' claims require individualized damages inquiries.  The plaintiffs presented evidence that Pom had disseminated the allegedly false and misleading message via radio, billboards, and national print media over a period of several years.  Also, the plaintiffs provided evidence that Pom succeeded in getting its message out, including Pom's co-owner's statement that "72% of people who buy pomegranate juice buy it *for*

---

[7] Hyundai's reliance on other cases are likewise misguided.  *Cohen v. DIRECTV, Inc.*, 178 Cal.App.4th 966, 970 & n.3 (2d Dist. 2009) is distinguishable on the grounds that the defendant DIRECTV there definititely established that many customers did not see any advertisements disseminated by DIRECTV.  Meanwhile, Hyundai has not shown any evidence that any putative class member never saw the inflated MPG representations. *Sevidal v. Target Corp.*, 189 Cal.App.4th 905, 919-20 (4th Dist. 2010) is inapposite because in *Sevidal*, defendant Target sold certain items online which, if the consumer clicked on the "Additional info" tab then the item was sometimes correctly labeled "import" while other times was incorrectly labeled "Made in USA."  But because Target did not keep records of who clicked the "Additional info" tab or which label was present when purchases were made, the court held that the class was not ascertainable.  But here, Hyundai does not dispute that all class members were likely exposed to the pervasive MPG representations or its ability to ascertain putative class members. Indeed, Hyundai's plan to re-label the MPG rates and provide monetary relief for all owners of the affected vehicles reflect the impact that MPG representations have on consumers as well as Hyundai's ability to ascertain them.

*the health reason . . . . .*"  Based on this evidence, the court concluded that the question whether Pom's representations regarding the health benefits were material and deceived consumers predominated over individual questions regarding specific advertisements.  *In re POM Wonderful LLC Mktg. & Sales Practices Litig.*, 2012 WL 4490860, at *5; *see also In re Apple, AT & T iPad Unlimited Data Plan Litigation*, 2012 WL 2428248, *4-5 (N.D. Cal. June 26, 2012) (the plaintiff should be given an opportunity to prove class-wide exposure); *Krueger v. Wyeth, Inc.*, 2011 WL 8971449, *11-12 (S.D. Cal. March 30, 2011) (the case involved "uniform material misrepresentations that were part of a pervasive, strategically orchestrated, widespread, multi-year advertising campaign.  As a result, common evidence can be used to establish the elements of this claim.").[8]

### 2.  Materiality, Reliance and Causation Are Subject to Class-Wide Proof

Hyundai argues that materiality raises individual issues because class members may have placed different weight on the relevance of the disclosure of EPA estimates and the statement that actual mileage may vary.  However, this is not a case about the disclosures, it is a case about whether Plaintiffs relied on the statements contained in Hyundai's advertising.  Plaintiffs have presented evidence that they did, and that they relied on the ads in making their purchase.  Having convinced Plaintiffs that the Elantra got 40 MPG and the Sonata got 35 MPG, though they did not, Hyundai seeks to avoid liability by arguing that Plaintiffs either knew or should have know that the MPG claims contained in the ads were false.  Hyundai argues that Plaintiffs should have relied on information in a Monroney Sticker or in other disclosures that they cannot say Plaintiffs

---

[8] The authorities relied on by Hyundai are, again, distinguishable.  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 586-87 (9th Cir. 2012), involved a very limited advertising campaign and not the extensive, multi-year campaign at issue here.  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1024 (9th Cir. 2011), involved a class definition that included people who knew the truth and thus were not deceived, whereas in this case, no consumers knew that the vehicles got much lower MPG rates than advertised until Hyundai's recent admissions.  And *Kaldenbach v. Mutual Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 846 (4th Dist. 2009), did not include uniform sales pitches, while in the case at hand, the MPG representations were absolutely uniform in all advertisements.

actually saw.  As set forth above, the information contained in these sources was itself false because Hyundai had submitted false statements to the EPA.  Moreover, the presence of EPA figures could not protect Hyundai from liability for advertising that contained affirmative statements that were false and misleading.  Defendant argues in effect that some members of the class may have had different experiences that the class representatives.

In a recent case, a court in this district expressly rejected the argument proffered here that a class that includes persons who purchased a product for reasons other than the defendants' alleged misconduct—that is, for reasons other than misrepresentations or omissions complained of by the named plaintiffs—cannot be certified *Guido v. L'Oreal, USA, Inc.*, 2012 WL 1616912, __ F.R.D. ___ (C.D. Cal. 2012) *on reconsideration based on other grounds*, CV 11-1067 CAS JCX, 2012 WL 2458118 (C.D. Cal. June 25, 2012).

In *Guido*, where the plaintiffs alleged that the defendant failed to label its anti-frizz hair serum as flammable in violation of the UCL and CLRA, the court found that the plaintiffs' testimony demonstrated that the alleged omissions and misrepresentations were material to their purchasing decision, and under the UCL, "[a] presumption, or at least an inference of reliance arises whenever there is a showing that a misrepresentation was material." citing *In re Tobacco II Cases,* 46 Cal.4th at 327, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009).[9]

Second, the court in *Guid*o pointed out that the focus of a UCL claim is "on the

---

[9] Authorities cited by Hyundai, *UFCW Local 1776 v. Eli Lilly and Co.,* 620 F.3d 121 (2d Cir. 2010) and *In re Prempro*, 230 FRD 555 (E.D. Ark. 2005) are inapplicable because they are not Ninth Circuit authority or apply California law.  Furthermore, the court in *IFCW Local 1776,* did not deny class certification on the basis that nationwide marketing strategy is not subject to common proof, but because the alleged misrepresentations regarding drugs were not material to most doctors.  620 F. 3d at 133.  Meanwhile, the court's opinion in *In re Prempo* was restricted to the product liability context, where "[n]o single happening or accident occurs to cause similar types of physical harm or property damage" and the marketing materials involved differed over time.  230 F.R.D. at 567.  Neither context is present here.

defendant's conduct . . . in service of the [UCL's] larger purpose of protecting the general public," and not on the reasons each class member purchased the serum  *Id.* at *6 (*citing In re Tobacco II Cases*, 46 Cal.4th, at 312, 93 Cal.Rptr.3d 559, 207 P.3d 20. Accordingly, there the court found that issues of whether the defendants' alleged omissions and misrepresentations about the flammability of Serum are unlawful, deceptive, unfair, or misleading to reasonable consumers are the type of questions tailored to be answered in "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Guido*, 2012 WL 1616912 at *4; s*ee also Wiener v. Dannon Co., Inc.,* 255 F.R.D. 658, 664 (C.D. Cal. 2009) (concluding that commonality was satisfied for a class of consumers who purchased Dannon yogurt products because the "class members clearly share common legal issues regarding Dannon's alleged deception and misrepresentations in its advertising and promotion of the Products"); *In re Apple, AT & T iPad Unlimited Data Plan Litigation*, 2012 WL 2428248, *4-6 (materiality and reliance may be established though common proof for a nationwide class); *Krueger v. Wyeth, Inc.*, 2011 WL 8971449, *4 (S.D. Cal. March 30, 2011) ("Plaintiff claims reliance does not require an individualized inquiry and can be proven on a classwide basis.  Under California law, a classwide inference of reliance is permitted when the deceptive conduct alleged is a material misrepresentation.").[10]

### 3.  Properly Conducted Survey Research May Be Used to Establish Class-Wide Issues

Dr. Itamar Simonson's report, while fatally flawed as discussed below, indicates

---

[10] In the two cases cited by Hyundai, *Edwards v. Ford Motor Co.*., 2012 WL 2866424, *4, 7-9 (S.D. Cal. June 12, 2012) and *Webb v. Carter's Inc.*, 272 F.R.D. 489, 502-03 (C.D. Cal. 2011), there was evidence that the named plaintiffs would not have seen disclosures if they had been added.  These cases are inapplicable here because each named Plaintiff testified that they did in fact see the MPG representations, and the fact that Hyundai's recently published re-labeling program is extensive and immediately became front page news across the country demonstrate that correcting the MPG representations would have been noticed by Plaintiffs.

that Defendant does not contest Dr. Krosnick's conclusion that social science research methodology can be used to effectively investigate whether potentially misleading advertisements conveyed to consumers misinformation that was relevant to them when making their purchase decisions.  Dr. Krosnick is an expert in the field of survey research and survey research methods which is a well-established and solidly respected scientific approach to measuring the behavior, attitudes, and beliefs of populations of individuals.  Among the many indicators of his expertise in the area, Dr. Krosnick has published numerous peer reviewed articles and served on the editorial board of the most prestigious journal in the field of survey research methods, *Public Opinion Quarterly*.  (Decl. of Jon A. Krosnick, PhD,  In Support of Plaintiffs' Reply to Hyundai's Opposition to Motion for Class Certification ("Krosnick Reply Decl."), ¶¶ 7, 8.)  In addition, he currently serves on the Board of Overseers of the General Social Survey and is co-Principal Investigator of the American National Election Studies which are the nation's leading academic survey research projects studying public opinion.  (Krosnick Decl. 2, ¶9.)  In Dr. Krosnick's initial report he outlined the appropriate steps in carrying out research methodology in this case.  (*See* Decl. of Jon A. Krosnick, PhD, In Support of Pls.' Mot. for Class Certification (Dkt. 47).)

    An expert's testimony or study must pass the gate-keeping requirements of FRE 702,[11] which governs admissibility of expert testimony.  As set forth below, Defendant's proffered expert Dr. Simonson's report is not the product of reliable principles and

---

[11] Under FRE 702, A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

1  methods; and he has not has reliably applied the appropriate principles and methods to
2  the facts of this case, and accordingly his report should be disregarded.

3      Hyundai's expert, Dr. Simonson, purports to use the same approach as Dr. Krosnick
4  suggests to find that consumers could not be misled by Hyundai's ads.  However, as
5  evidenced by Dr. Krosnick's Second Report, and described below, Dr. Simonson's report
6  was not carried out in keeping with best scientific practices and therefore it should be
7  disregarded.  There are many clear flaws in Dr. Simonson's report.  Specifically, the
8  survey examines the wrong population, "owners of 2011 and 2012 Elantra models as well
9  as 2011 and 2012 Sonata models (not including Sonata Turbo and Hybrid)," rather than
10 "people who purchased or leased" these models.  (Krosnick Reply Decl., ¶¶ 18-19.)
11 Most critically, Dr. Simonson's study is not an experiment with internal validity because
12 it did not randomly sample individuals from the population of interest.  A random sample
13 is a key component of survey research based on well-established theory and empirical
14 evidence and must be used in order to permit generalization from the sample to the
15 general population.  A random sample could have been achieved by beginning with a list
16 of all people who purchased the vehicles during the relevant time and use a random
17 selection device to identify a subset of that population, or by drawing a large
18 representative sample of all adults in the U.S. and identifying a subset of individuals who
19 purchased the models of interest.  (*Id.* ¶20.)  However, Dr. Simonson did neither, but
20 instead used individuals who signed up to compete in on-line surveys in return for money
21 or prizes.  (*Id.* at ¶21; Expert Report of Dr. Itamar Simonson in support of Hyundai's
22 Opp'n to Pls.' Mot. for Class Certification ("Simonson Report"), Ex. E (Dkt. 58-8), at 8.)
23 Dr. Simonson's study also imposed bias, by excluding from the sample individuals who
24 (1) would later purchase one of the models in question, (2) possessed what the
25 researchers deemed unrepresentative expertise or knowledge, and (3) were involved in a
26 joint decision to buy a car.  (*See* Krosnick Reply Decl., ¶¶ 24, 25, 27.)
27      Dr. Simonson's study was also flawed in that the sample included data from 93
28 individuals who supposedly completed the study accurately but whose views were never

validated.  In addition Dr. Simonson states that his sample includes 666 individuals 297 of whom were Hyundai owners, according to the results reported in his Appendices, the actual number of Sonata owners in the study was 140 and the actual number of Elantra owners was 157.  (*Id.* ¶29.)  According to normal scientific practice these numbers should have been used to compute the statistical significance of the impact of the experiment, not the much larger number used by Dr. Simonson.  (*Id.* ¶33.)

As mentioned earlier, the design of Dr. Simonson's experiment was flawed in that the experimental stimuli did not contain or even resemble the ads actually in question. (*Id.* ¶34.)  Another major flaw in the study is that the study included questions that asked study participants how important certain information would be if they were to make a decision "today" about what car to buy.  This type of question, which asks people to guess what decisions they would make in the future, has long been known to be an unreliable method of determining intentions.  Extensive literature in the field documents that answers to this sort of questions should be completely disregarded for the purposes of gauging the magnitude of the impact of various types of information may have on decisions.  (*Id.* ¶35.)  Moreover, it is clear from Dr. Simonson's own publications that he is familiar with this accepted principle, but has chosen to ignore it in his study in this matter.  (*Id.* ¶36.)   Research is clear that such questions have no validity.  Neither does Simonson's survey ask the most relevant questions, such as whether consumers consider MPG rates in purchasing decisions and whether consumers would pay less money for vehicles with lower MPG rates than advertised.   Because Dr. Simonson's study falls far short of having been carried out with proper scientific methodology, his testimony fails to meet the requirements of FRE 702 and should be disregarded.[12]

---

[12] Furthermore, Dr. Simonson's report goes to merits issues of materiality and not class certification issues, which is inappropriate here where the court permitted only class certification discovery and set a tight briefing schedule.

**D.      Plaintiffs Have Demonstrated That There Is a Reliable Damages Methodology**

Plaintiffs submitted expert testimony from Professor Molly Espey who provided expert opinion regarding consumers' valuation of automobile fuel economy, explained a general methodology for determining how these values influence market prices of automobiles, and described how this method could be used to estimate vehicle price differentials based on different levels of fuel economy.  Her report demonstrates that there is an economic formula by which one can determine how much monetary value is attributable to each mile per gallon increase in a vehicles MPG, while controlling for other vehicle characteristics.

Defendant's second expert, Keith Ugone, is proffered for the purposes of discrediting Plaintiffs' expert Dr. Molly Espey.  However, while Dr. Espey's report and proposed methodology for calculating damages in this matter is based on her peer-reviewed publications in the area of both consumer valuation and hedonic regression,[13] Dr. Ugone has no prior experience in the field of fuel economy.  Dr. Ugone was not hired to provide a damage analysis here, but to discredit Plaintiffs' expert.  He is a professional witness whose expertise is in the area of opposing class certification, something he has done in every case in which he has been retained to opine on class certification.  (McCune Decl., ¶14; Ex. 10-Dep. Tr. of Ugone, at 35:11-23.)  Moreover, his bias is such that given an hypothetical where the facts were every person was misled by an advertisement that each individual paid the same price and that 100% said that fuel economy was an important factor in buying the vehicle, he still opined that class certification would be inappropriate.  (*Id.* at 83:12-87:3.)  Notably, Dr. Keith Ugone does not argue that hedonic regression analysis cannot be used to determine the price differential here.  This is wise, given the fact that hedonic regression is well accepted in academic literature.  (Expert Report Molly Espey, PhD, In Support of Pls.' Reply to Hyundai's Opp'n to Mot. For Class Certification ("Espey Reply Report"), ¶1.)  Her work

---

[13] *Fuel Economy: What is it Worth? (Comparative Economics);* M. Espey, F. Fakhruddin, L. Gering, and H. Lin, (2007); *see also* publications listed in Espey Reply Report, at ¶1.

is cited by her academic peers who also study the very real field of valuation of fuel economy.  Most recently, professors of Economics at Northwestern and MIT's Sloan School, respectively, both of whom are members of National Bureau of Economic Research[14] (NBER) recently cited her work on this subject.  See *Are Consumers Myopic? Evidence from New and Used Car Purchasers*, Busse and Knittel.  Rather than argue that Hedonic analysis cannot be used to determine damages, Dr. Ugone argues that Professor Espey has used inappropriate values for certain constants.  Specifically, Professor Ugone argues that MSRP is a not a reasonable proxy for actual price paid.  However, in Professor Espey's model, MSRP is not being used for the purposes of showing what each class member actually paid for their vehicle, but is being used as a stand in or proxy value.  (*Id.* ¶3.)  Use of MSRP instead of actual price paid will result in unbiased and consistent estimates of the value of fuel economy unless the difference between MSRP and actual price paid is correlated with one of the independent variables in the model.  (*Id.*)  If that is the case, a routine adjustment can be made to produce unbiased and consistent estimates to account for that correlation.

Dr. Ugone's position that one needs to use actual prices paid for vehicles is untenable.  It would mean that economists could not do hedonic regression analyses for just about any consumer goods, inasmuch as people seldom pay a uniform price for a good.  In fact, these kinds of analyses are commonplace and well accepted.  (*Id.* ¶1.)

---

[14] The NBER is the nation's leading nonprofit economic research organization. Twenty-two Nobel Prize winners in Economics and thirteen past chairs of the President's Council of Economic Advisers have been researchers at the NBER. The more than 1,100 professors of economics and business now teaching at colleges and universities in North America who are NBER researchers are the leading scholars in their fields. These Bureau associates concentrate on four types of empirical research: developing new statistical measurements, estimating quantitative models of economic behavior, assessing the economic effects of public policies, and projecting the effects of alternative policy proposals.

Similarly, Dr. Ugone's challenge of the use of EPA mileage as a proxy for MPG expectations is misplaced. EPA mileage estimates are being used not for the veracity but as a reasonable proxy for MPG expectations. (*Id.* ¶4.) When differencing to determine the impact of a change in MPG or a different expectation of MPG, any deviation from actual individual expectations disappears. At worst, there would be an underestimate of the value of an incremental change in fuel economy. (*Id.*)

Finally, determination of each individual class member's expectations of fuel economy is not relevant to the hedonic analysis here. Market prices of vehicles are determined by the interaction of millions of consumers considering hundreds of different models of vehicles. If more people desire a particular type of vehicle, producers of those vehicles will be able to set a higher initial price (MSRP). If demand for a particular type of vehicle declines, the market price of that vehicle would decrease as well. (*Id.* ¶5.)

As Professor Espey states, if automobile buyers believe a particular vehicle gets better fuel economy than it actually does, they will be willing to pay more, on average, for that vehicle, boosting the market price of that vehicle for all buyers, regardless of how much each individually values an increase in fuel economy. Thus all buyers of a particular vehicle would face a higher price as a result of a misconception about the actual achievable fuel economy, for example.[15] This is true regardless of how or how much one drives a vehicle or what price one pays for gasoline. All buyers of a particular model of vehicle would pay more than they would have if the overall demand had been lower. Even if they pay less than MSRP, they pay less than a higher MSRP than would have existed if demand were lower. Thus varying consumer driving behavior is not

---

[15] Dr. Ugone's argument that plaintiffs have failed to propose an analysis for putative class members who purchased or leased used vehicles is unavailing. Plaintiffs have never sought to represent anything other than a class of individuals who purchased or leased new Hyundai vehicles.

1  relevant to the market price of a vehicle or hence to actual damages incurred at the point

2  of purchase.  (*Id.* ¶6.)[16]

3       Accordingly, because Dr. Ugone's attacks on Dr. Espey's methodology fail to

4  demonstrate that she does not qualify as an expert under FRE, and he fails to demonstrate

5  that he is an expert in the relevant field or that his testimony is the product of reliable

6  principles and methodology, his testimony should be disregarded.

7       Moreover, Dr. Ugone's position that damages cannot be calculated here is

8  puzzling, since by implementing Hyundai's own re-labeling program wherein it offers to

9  reimburse some gas costs to each purchaser, Hyundai concedes that class membership is

10 ascertainable and that there are ways to monetize damages associated with inflated gas

11 mileage.

12 **E.   The Proposed Classes Comport With Article III**

13      Hyundai argues that Plaintiffs' proposed classes violated Article III because the

14 only people who have standing to bring this action are purchasers

15           who reviewed the ads in question, did not see other material
16           indicating those were EPA estimates, found the EPA language
             material and [who] did not achieve the stated mileage"  have
17           suffered an injury in fact.

18 (Opposition Brief (Dkt. 58), at p. 22.)

19      Such a narrow view of standing has been rejected by the Ninth Circuit which has

20 explicitly and repeatedly stated, "[I]n a class action, standing is satisfied if at least one

21

22 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

   [16] Hyundai's authority, *Weiner v. Snapple Beverage Corp.,* 2010 WL F.R.D. 3119452
23 (S.D.N.Y. Aug. 5, 2010), is inapposite.  In that case, the plaintiff's expert's for
   "yardstick" damages approach failed to identify the non-"all natural" labeled product to
24 which Snapple would be compared, does not explain approach to isolate impact of "all
   natural" labeling from other factors that affect price of Snapple and competitors, and fails
25 to account for various prices that putative class members actually paid.  *Id.* at 7.  But
   here, Plaintiffs' expert Dr. Espey has set forth peer-reviewed methodology for isolating
26 incremental valuations of MPG as affecting price, identifies that comparisons will be all
   competitor models in the market, and establish that price difference is an absolute amount
27 based on the MSRP.

28

named plaintiff meets the requirements. . . . Thus, we consider only whether at least one named plaintiff satisfies the standing requirements. . . ." *Bates v. United Parcel Serv., Inc.,* 511 F.3d 974, 985 (9th Cir. 2007) (en banc); *see also Fleming v. Pickard,* 581 F.3d 922, 924 n. 3 (9th Cir. 2009); *Stearns v. Ticketmaster Corp.,* 655 F. 3d 1013, 1021 (9th Cir. 2011) (reiterating the Ninth Circuit's precedence that standing focuses "on the representative party, not all of the class members, and has done so for many years");

Here, as set forth above (*infra* Section III.B.1-3) all of the proposed class representatives bought either a Hyundai Elantra or a Hyundai Sonata relying on the advertisements at issue here.  Each also testified that the vehicles did not perform as advertised and achieved substantially fewer miles per gallon that the advertised 40 MPG and 35 MPG.  Accordingly the proposed class representatives have standing.

**F.   California Law Should Apply to Claims of All Class Members**

Defendant discounts Plaintiffs' contention that California law should apply to the claims all class members.  However, Plaintiffs have presented evidence that California has an interest in applying its laws in this case.  Hyundai is headquartered in California. The advertisements at issue were designed in California and the decision to disseminate the ads was made in California.  Furthermore, Hyundai's decision and publication of its apology, MPG re-labeling, and reimbursement program originated and was disseminated from its California office.  (McCune Decl., ¶ 2; Ex. 1.)  Thus, Plaintiffs have met their burden of showing that California has significant contact with each class member's claim, and that application of California law would therefore be constitutional.  As a result, the burden is shifted to Defendant to show that some foreign law, rather than California law, should apply.  *In re POM Wonderful LLC Mktg. & Sales Practices Litig.*, ML 10-02199 DDP RZX, 2012 WL 4490860, *2 (C.D. Cal. Sept. 28, 2012) (citing *Wash. Mut. Bank v. Superior Court,* 24 Cal.4th 906, 921 (2001).  Here, Hyundai has not met that burden.

Recently, a court in the Central District certified a nationwide class in a consumer fraud case where, as here, the plaintiffs had demonstrated that the defendant corporation was headquartered and located solely in California, developed its marketing strategies in

California, and produced all of its products in California.  *In re POM Wonderful LLC Mktg. & Sales Practices Litig.*, ML 10-02199 DDP RZX, 2012 WL 4490860 (C.D. Cal. Sept. 28, 2012).  Moreover, at a minimum, this case is analogous to the situation in *In re Apple AT&T Unlimited Data Plan Litig.*, where the court declined to rule at the class certification stage as to whether California law should or should not apply to the plaintiffs' claims.  There the court stated,

> there are too many preliminary questions that cannot be resolved at this stage of the case, including whether California actually has significant contacts with the claims against ATTM, the strength of the interests those contacts create, and how many states' laws are implicated and how many are materially different from California law. Thus, at this early stage, the court cannot conclude that a nationwide class would be improper.

*In re Apple, AT & T iPad Unlimited Data Plan Litig.*, C-10-02553 RMW, 2012 WL 2428248 (N.D. Cal. June 26, 2012).

## IV

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification should be granted in its entirety.

Dated:  November 16, 2012.                                    MCCUNEWRIGHT LLP


                                          By: /s/  *Richard D. McCune*
                                               Richard D. McCune
                                               Attorneys for Plaintiffs